Frances E. BEALL, et al., Plaintiffs,

v.

Dr. John R. CURTIS, et al.,
Defendants.

Civ. A. No. C81-12-ATH.

United States District Court,
M.D. Georgia,
Athens Division.

March 20, 1985.

Martha M. Pearson, Athens, Ga., for plaintiffs.

Alfred L. Evans, Jr., Sr. Asst. Atty. Gen., State of Georgia, Atlanta, Ga., for defendants.

## ORDER

SHOOB, District Judge.[*]

### INTRODUCTION

This is an action under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiffs are six female nurse practitioners who, at the time of the filing of this lawsuit in February, 1981, were employed at the University of Georgia Health Service by the defendant Board of Regents of the University System of the State of Georgia. Plaintiffs allege that defendant Board of Regents violated the Equal Pay Act and Title VII by compensating them at a significantly lower salary than a male physician's assistant who performs substantially equal work. They further allege that the Board of Regents intentionally segregated the positions of nurse practitioner and physician's assistant on the basis of sex and that such job segre-

gation has resulted in substantially lower wages and benefits for the nurse practitioners. Plaintiffs claim also that since the differential classification was created, they have been denied employment opportunities that have been offered the male physician's assistant on account of sex. They also allege that the continued existence of the classification system which precludes all nurse practitioners, including plaintiffs, from competing for any physician's assistant position has an adverse effect on women in violation of Title VII. The second count of their complaint alleges retaliation by defendants Dr. John Curtis, Director of the Health Service, and Warren Loar, Administrator of the Health Service.

### FINDINGS OF FACT

The University of Georgia Health Service is a primary health care facility that provides both outpatient and, on a more limited basis, inpatient medical care to students at the University of Georgia. The Health Service is staffed by physicians, nurse practitioners, physician's assistants, registered nurses, licensed practical nurses, and other support staff such as nursing assistants, physical therapists, laboratory technicians, and pharmacists. There are over 100 employees at the Health Service. The Health Service provides fee-paid care to the student population at the University and to student spouses on a fee-for-service basis.

The defendant Board of Regents of the University System of Georgia is a constitutionally created agency of the State of Georgia charged with governing, controlling, and managing the University System of Georgia and the institutions within the system. Defendant Board is the employer of the plaintiffs. Defendant Dr. John Curtis has directed the University of Georgia Health Service since 1968; defendant Warren Loar has been administrator of the facility since 1976.

Nurse practitioners and physician's assistants are "mid-level" practitioners of health care. Use of mid-level practitioners has grown during recent years in order to

[*] U.S. District Judge, Northern District of Georgia, sitting by designation.

offer competent but economical health care in a variety of settings where the skills and experience of a physician are not required.

The University of Georgia Health Service originally provided medical services by physicians and nurses. Beginning in 1973, the Health Service trained some of its nurses to serve as nurse practitioners. In 1977 all the nurse practitioners were women who had received their nurse practitioner training at the Health Service. In January 1977 the Health Service hired its first physician's assistant. Whereas nurse practitioners, like other nurses, were classified employees, the position of physician's assistant was given faculty status. The position of physician's assistant was also given a significantly higher salary than that established for nurse practitioners or nurses. The first physician's assistant selected was a man, Henry Curran. The decision to hire Mr. Curran spawned this lawsuit.

Because nurse practitioners are nurses, they undergo regular nursing training before entering a nurse practitioner training program. There are three educational routes to becoming a registered nurse: a four-year bachelor of science degree program, a three-year diploma program from a hospital school of nursing, and a two-year associate of science degree program. In this case two of the plaintiffs (Bancroft and Hanson) are graduates of two-year programs; two (Beall and Eicher) are graduates of three-year programs; and two (Brown and Jacobson) hold the degree of bachelor of nursing as graduates of four-year college R.N. courses.

Educational requirements to become a registered professional nurse through each of these programs include course work in basic health sciences: anatomy, physiology, chemistry, microbiology, pharmacology, nutrition, and accompanying laboratory work for each of these courses. Nursing courses are taught by either Ph.D. faculty members of the academic institution with which the nursing school is affiliated or by nursing faculty in the hospital-based diploma program. Nursing students participate in hospital-based clinical nursing rotations, including general medical, surgical, emergency room, orthopedic, pediatric, obstet-rical and gynecological, and psychiatric nursing. In addition, nursing rotations may include non-hospital-based affiliations such as at community health and out-patient clinics. Nursing students continue formal course work during the rotations, often attending lectures by physicians in the particular branch of medicine being studied on rotation. The primary difference between the four-year baccalaureate degree and the three-year diploma is the additional liberal arts requirements in the four-year program. The two-year associate degree program differs from the other two primarily by providing less community health and nursing management training.

As R.N. students, plaintiffs were educated in a nursing model as opposed to a medical model. As noted above, their instructors were primarily nurses or members of a general college faculty rather than physicians. As a consequence, some of the basic medical science courses, which had "medical" names, had a content and approach that were designed particularly for nurses and not physicians.

The University of Georgia Health Service decided in 1973 to initiate a formal educational program for registered nurses with at least two years' primary care experience to enhance their skills to enable them to diagnose and treat commonly occurring diseases and conditions in an adult population. This training had a more "medical" aspect: nurses learned to perform "delegated medical functions" in consultation with supervising physicians.

The nurse practitioner training program at the University of Georgia, the first one in the state, was offered each year from 1973 to 1978; the program varied somewhat but the content remained essentially the same. Each course of study contained both didactic portions and clinical experiences taught and supervised by physicians and a nurse practitioner on the Health Service staff. The didactic portion comprised between 120 and 202 contact (not credit) hours; it was essentially one long course covering a variety of topics. There were numerous quizzes and a single final exami-

nation. The clinical experience and preceptorship time involved 265 to 300 contact hours. It was an on-the-job training program consisting of an hour or two of classroom instruction per day for four or five days per week while plaintiffs continued to perform their regular nursing responsibilities at the Health Service. In connection with their normal duties, plaintiffs received additional clinical training.

The program at the Health Service varied in length from 3½ to 12 months but was typically 9 months long; it was unaccredited and did not offer credit or degrees. Plaintiffs paid no tuition. Plaintiffs' medical expert, Dr. Pickard, viewed the N.P. training program operated by the University Health Service as being at the lower end, in terms of duration and content, of what he considered to be an acceptable N.P. training program.

Although initially created as an in-house project to provide better care to students at the University of Georgia, the program was approved by the American Nurses Association (ANA) as an Adult Nurse Practitioner Program, entitling its students to sit for the comprehensive national ANA Nurse Practitioner Examination. The program prepared students to pass this national examination and to function in a variety of primary care settings other than the University Health Service. Nurses who were not employees of the Health Service also enrolled in the program. Students graduating from the program have gone on to work in the Georgia Merit System and to become licensed to practice as nurse practitioners in other states.

Plaintiff Beall graduated in 1971 from St. Joseph's Hospital School of Nursing in Paterson, New Jersey, with a diploma in nursing. She became licensed to practice nursing in both New Jersey and New York, and she worked at Overlook Hospital in Summit, New Jersey and subsequently at the New York University Medical Center. While at NYU Medical Center, Ms. Beall received post-graduate education in cardiovascular nursing. After working two years in the intensive care unit at NYU, Ms. Beall moved to Georgia and began working at the University of Georgia

Health Service in October 1973 as a staff nurse. She completed the nurse practitioner curriculum at the Health Service in December 1974. She is certified by the American Nurses Association and the Georgia Board of Nursing as an adult nurse practitioner.

Plaintiff Bancroft graduated from Columbus College in 1972 with a degree of Associate in Science in Nursing. After being licensed as a registered nurse in 1972, Ms. Bancroft worked as a charge nurse at Athens General Hospital for two years before coming to the Health Service as a staff nurse in 1974. She completed the University of Georgia Health Service nurse practitioner program in 1975. She has been licensed as a registered nurse since 1972 and is certified by the American Nurses Association and Georgia Board of Nursing as an adult nurse practitioner. Ms. Bancroft has worked as a nurse practitioner at the UGA Health Service for four years and at Cornell University Health Services and several hospitals in Atlanta. She is currently head nurse at the Diabetes Treatment Center, Shallowford Community Hospital.

Plaintiff Hanson graduated from Georgia College at Milledgeville with an Associate in Science in Nursing in June, 1972. She received her license as a registered nurse in Georgia in January 1973, and began working at Athens General Hospital in Athens, Georgia as a graduate nurse in June 1972. She began working at the Health Service as a staff nurse in July 1973. She completed the Health Service nurse practitioner program in December, 1974. She is certified as an adult nurse practitioner by the American Nurses Association and the Georgia Board of Nursing.

Plaintiff Jacobson graduated from the Youngstown Hospital School of Nursing in 1957 with a diploma in nursing. She subsequently received a B.S. in Nursing from the Medical College of Georgia in 1977. She became licensed as a registered nurse in Ohio in 1957. She has worked as a registered nurse at Athens General Hospital; at St. Mary's Hospital for five years; and

General Time, Corp. in Athens, Georgia. She began working at the University of Georgia Health Service in 1977 and completed its nurse practitioner program in May, 1978. She is certified by the Georgia Board of Nursing and the American Nurses Association as an adult nurse practitioner.

Plaintiff Eicher received a diploma in nursing from Alleghany General Hospital School of Nursing in 1950. She was licensed as a registered nurse that year. She has worked as a staff nurse in a psychiatric facility, as a visiting nurse, and as a staff nurse in a hospital in El Paso, Texas. Before beginning work for the University of Georgia Health Service in 1977 she worked part-time with the Northeast Georgia Health District in gynecology. She completed the Health Service nurse practitioner program in 1978. She left the Health Service in 1981; she currently resides in Miami and is licensed by the State of Florida as an advanced registered nurse practitioner in adult primary care. She is certified as an adult nurse practitioner by the American Nurses Association.

Plaintiff Brown graduated from the University of Alabama School of Nursing with a B.S. in Nursing in 1959. Since becoming a registered nurse, she has been employed as a staff nurse in hospitals in Georgia and Virginia. She was employed by the Northeast Georgia Public Health District for 3 years and 9 months as a nurse clinician and as the coordinator of the child health program. While employed with the Health District, she completed the nurse practitioner training program at the University of Georgia Health Service in 1976; she began working for the Health Service as a nurse practitioner in 1977.

At the Health Service, nurse practitioners see patients in both the general medical clinics and in two specialized clinics, the gynecology clinic and the immediate care clinic (treatment room). In the general medical clinics, the nurse practitioners diagnose and treat a wide variety of illnesses. The usual practice of the Health Service is to assign patients to the first available clinician, whether a physician, nurse practitioner, or physician's assistant; exceptions occur when students have appointments for particular practitioners or have specialized problems. Many of the problems presented by the young adults who use the Health Service are uncomplicated, but plaintiffs and other clinicians there have diagnosed and treated diseases as serious as pyelonephritis and pneumonia. Each of the plaintiffs testified about life-threatening illnesses or emergencies she has been called upon effectively to manage or identify, such as drug overdoses, acute asthmatic attacks, anaphylactic reactions, diabetic acidosis, and a malignant thyroid tumor.

Plaintiffs Bancroft, Eicher, Jacobson, and Brown work or worked regularly in the gynecology clinic, giving annual gynecological physicals, treating and diagnosing diseases such as vaginitis and pelvic inflammatory disease, and performing surgical techniques such as cryotherapy. Each of the practitioners working in the gynecology clinic is trained to identify and manage emergencies such as ectopic pregnancies.

All of the plaintiffs have worked in the immediate care area or treatment room where musculo-skeletal problems and trauma [1] are treated. The Health Service has limited facilities to deal with more than minor trauma. Minor fractures, sprains and strains, and superficial lacerations are seen in the treatment room, but all fractures requiring casting are referred to Athens orthopedists. Anything more severe is directed immediately to area hospitals. The treatment room handles only trauma during regular hours, but after hours it handles any type of problem presented.

The evaluations of plaintiffs throughout their employment at the Health Service reveal that they all do excellent work. The evaluations indicate both that their clinical skills are excellent and that each of the plaintiffs is a dedicated professional and

---

**1.** "Trauma" means any injury or wound caused by external force or violence: the term includes events as different as a shotgun wound and a bee sting.

committed to providing the best possible care to students at the University.

Mr. Curran, the first physician's assistant hired by the Health Service, obtained a bachelor in business administration from the University of Georgia. In his work toward that degree, he took two courses in general chemistry and two in organic chemistry. While he was a student, Mr. Curran worked as an inhalation therapy technician, as an electrocardiograph technician, and as an emergency medical technician at St. Mary's Hospital in Athens, Georgia. The first two positions involved on-the-job training while the third involved 140 hours of classroom training.

After graduation from the University of Georgia and the paramedical training mentioned above, Mr. Curran entered the physician's assistant training program at the Medical College of Georgia in 1974.

The P.A. training program at the Medical College of Georgia is a two-calendar-year program that is fully accredited by the national accrediting body, the Committee on Allied Health Education and Accreditation of the American Medical Association. P.A. training programs operated by medical schools such as the Medical College of Georgia (the school attended by Mr. Curran as well as by the other two P.A.s currently employed at the Health Service) ordinarily use the same medical faculty used to teach medical students; they teach the same basic science courses to medical students and P.A. students alike. Plaintiffs' medical expert, Dr. Pickard, considered the program of the Medical College of Georgia to be one of the better P.A. programs.

Mr. Curran attended the P.A. training program at the Medical College of Georgia for two calendar years or eight academic quarters. The first three quarters comprised classroom and laboratory training; the other five quarters comprised clinical rotations.

The didactic portion of Mr. Curran's training included separate courses in anatomy, physiology, biochemistry, clinical biochemistry, neuroanatomy, neurological examination, microbiology, principles of human physiology, dog lab, pharmacology, surgery, and physical diagnosis.

Following the didactic portion of his program, he had six-week rotations in surgery, family practice, pediatrics, and internal medicine; four-week rotations in emergency medicine, obstetrics and gynecology, mental health, pulmonary medicine, and urology; and a two-week rotation in orthopedics. These rotations were followed by a ten-week preceptorship in the office of a physician in Covington, Georgia.

Mr. Curran's rotations were in the medical model: his surgical training, for example, involved assisting in the actual performance of surgery as opposed to functioning as a "scrub nurse" or "circulating nurse" in the nursing model. He was trained to perform as a first or second assistant to a surgeon, providing exposure and controlling bleeding by tying off or cauterizing blood vessels. He was taught to and did suture not only skin but different planes of body tissue as well. He was also taught to write up post-operation orders. He learned to read chest X-rays in his pulmonary medicine rotation with additional X-ray training in various other rotations.

After completing the program at the Medical College of Georgia and receiving a Bachelor of Science degree, Mr. Curran passed the national physician's assistant examination. His first employment as a physician's assistant was as supervisor of the medical section of the Early Release Center at Milledgeville, Georgia, where he was responsible for health care of approximately 400 prisoners. There was no full-time physician (a contractual arrangement for part-time services existed) and Mr. Curran was in charge of the day-to-day operations. In addition to direct involvement in providing health care himself, he supervised a chief nurse and two staff nurses, as well as a pharmacist and clerk-typist.

Numerous witnesses testified about the training, skills used, and available skills of plaintiffs and of Mr. Curran. There is no doubt that the physicians, registered nurses, physician's assistants, and nurse practi-

tioners who work at the University of Georgia Health Service usually provide identical or substantially similar health care services to patients. The overlap of categories of health care providers does not, however, make irrelevant the different levels of medical competence, skill, and expertise, or the different responsibilities, of persons in different categories. No one would argue that a physician and a nurse who routinely handle identical problems and provide identical treatment perform an identical job; a physician is expected to demonstrate greater expertise that makes him or her more valuable in the unusual case.

An appraisal of the courses taken by plaintiffs and by Mr. Curran in their respective training programs reveals that Curran had significantly greater training in medical diagnosis, neurological examination, and surgery. In addition, Curran had somewhat greater training in anatomy, neuroanatomy, biochemistry, and physiology. This difference made Mr. Curran more expert in the management of trauma; Dr. Albert Phillips, who set up the N.P. training program and was its primary medical instructor, himself stated that Mr. Curran could manage trauma better than any of the six plaintiffs. Plaintiffs conceded that their training program at the Health Service focussed on areas other than trauma and that they had no instruction in surgery.

Witnesses appraised the skills of plaintiffs and of Mr. Curran in general medicine, in gynecology, and in trauma. The testimony revealed little difference in the ability of plaintiffs and of Mr. Curran to handle general medical problems; in fact, by virtue of their experience, plaintiffs appear to have greater ability in handling gynecological complaints. On the other hand, the expert witnesses were unanimous in stating that Mr. Curran had more expertise in trauma management. Bernadette Johnson, a nurse practitioner at the Health Service who is not a party to this suit, stated forthrightly that Curran's training gave him a much higher level of expertise at diagnosis and management of trauma than any of the nurse practitioners (including herself) possessed. Dr. Robert Curry,

a professor at Emory University School of Medicine and an expert in medical education, stated that, with regard to medical diagnosis generally, the education and training received by the six plaintiffs were not substantially equal to, or even comparable to, the training received by Mr. Curran. Dr. Curry further stated that plaintiffs had less medical expertise and ability in making a diagnosis and in initiating appropriate treatment. Dr. Arthur Harwood, clinical director at the Health Service, who was qualified as an expert in general medical practice and in treatment room practice, agreed that in the area of medical diagnosis the Health Service N.P. training program was not of a length or quality to give plaintiffs as high a level of medical competence as Mr. Curran. Dr. Curtis, Director of the Health Service, asserted that because of Curran's broader, deeper, and more comprehensive medical education, Curran could perform all of the medical tasks that a nurse practitioner could, but that, because of the more limited training of nurse practitioners, the converse was not true.

Nor did Dr. Glenn Pickard, a professor of internal medicine at the University of North Carolina and an expert on mid-level health care and training who testified persuasively on behalf of plaintiffs, dispute Curran's higher level of expertise in management of trauma. Dr. Pickard characterized the greater training and competence of Mr. Curran as "a superfluous, expensive redundancy" in the context of a student health service.

On the basis of the testimony presented in court, the Court finds that Mr. Curran had greater training and greater expertise than any of plaintiffs in medical diagnosis and treatment, especially in the area of trauma, and that on occasion he made use of that greater training and expertise. The Court accords weight to the *bona fide* judgment of Health Service officials as to the value of Mr. Curran's additional training and skill, and discounts the adversarial criticism of that judgment offered by Dr. Pickard.

The Health Service has computerized records showing the types of problems seen by its health care providers. Dr. Walter J. Brown, Jr., supervised the preparation of summaries of the computer printouts reflecting the types of problems seen by the six plaintiff nurse practitioners and the three presently employed physician's assistants. The summaries categorize the problems seen at the Health Service into four groups, namely, trauma, non-trauma, normal gynecology, and problem gynecology. For the initial year covered (July 1, 1978 to June 20, 1979) Mr. Curran dealt with more patient problems than any of plaintiffs (3791 as compared to 3407 for plaintiff Brown, 2858 for plaintiff Jacobson, 2603 for plaintiff Eicher, etc.) This greater volume of total problems seen is a typical, but not invariable, pattern for all of the years covered, *i.e.*, 1978–79 through 1983–84 (up to and including March, 1984).

The practices of Mr. Curran and of plaintiffs differ also in the types of problems seen. The percentage of problems seen by Mr. Curran that relate to trauma has been substantial, ranging from 39.5% to 63.6% for the six-year period, with an overall percentage of approximately 51.5% of his work being in this area. The bulk of the problems handled by Mr. Curran outside of trauma have been in the general medical area, with only slight involvement in normal and problem gynecology, although he has worked in those fields at the Health Service. This same difference appears in the practice of the nurse practitioners and the two other presently employed physician's assistants (female and male).

By way of comparison, the plaintiff most heavily involved in trauma, Hanson, averages about 4% of her annual case load in this area; the other plaintiffs generally have less than 1% of their case load in trauma. The summaries show substantial functional differences in the work of physician's assistants and nurse practitioners in the daily work of the Health Service. A summary of all problems seen by all physician's assistants as compared to plaintiffs shows the following distribution:

P.A.s: 44.5% trauma, 54.9% non-trauma, .1% normal gynecology, .5% problem gynecology

N.P.s: 1% trauma, 60.2% non-trauma, 19.5% normal gynecology, 19.3% problem gynecology.

Plaintiffs' testimony is entirely consistent with this quantitative difference in the day-to-day functioning of the physician's assistants and nurse practitioners at the UGA Health Service. Plaintiff Beall said, for example, that the largest single category of her work involved the genito-urinary tract. Plaintiff Brown testified that the greater part of her work at the Health Service related to these same areas. Plaintiffs Brown, Eicher, and Jacobson testified that their work concerned illness or disease as opposed to trauma.

The Court has carefully considered a document called "position data form for administrative and professional positions" prepared concerning Mr. Curran's job as part of a university-wide job and pay survey. The document, prepared in Mr. Curran's name, was reviewed by Dr. Phillips and Dr. Curtis. Plaintiffs rely heavily on one question and response on that form that concerned the nature and scope of functions performed:

[Q:] If, together with your position, there are other positions administratively responsible to your immediate administrative officer, give the name, title, and briefly a summary of the functions of these other positions.

[A:] Nurse practitioner I: provides essentially the same services to patients but does not serve the on-call schedule.

The Court finds that the document does not establish equivalence of N.P. and P.A. positions. Noteworthy is a comment by Dr. Phillips in his review of the document: "In general, Mr. Curran's overall value has been underestimated in the prior portions of this document." In any event, the taking of night call in rotation with physicians distinguishes Mr. Curran's practice from that of plaintiffs; as made clear by Health Service physicians, night call entails a

front-line responsibility that demands an ability to manage trauma.

Another difference in the work of nurse practitioners and physician's assistants at the Health Service is revealed by the different regulatory and professional limitations that circumscribe their respective practices. The practice of physician's assistants is governed by statute, Official Code of Georgia Annotated §§ 43–34–100 to –108. Physician's assistants are subject to the jurisdiction of the Composite State Board of Medical Examiners. In order to become certified to practice in the state, a physician's assistant must be sponsored by a physician who applies to the Board for permission to use the physician's assistant and includes in the application a job description that sets forth the powers and duties of the assistant.[2] The practice of a physician's assistant must be under the supervision of a physician and must be conducted in a principal office of the sponsoring physician.

The work of a physician's assistant is limited to that set forth in the job description except when performed under the direct supervision and in the presence of the physician utilizing him, in which case the physician's assistant may perform any work authorized for physicians that the assistant is competent to do. Mr. Curran's job description is four pages long; three pages consist of a general outline of his powers and duties. The job description is not limited to particular ailments.

Nurse practitioners are regulated by the State Board of Nursing, which has established standards for their practice; the category of nurse practitioner is not established by statute, but nurse practitioners are governed by the statutes that apply generally to nurses. Before any nurse practitioner may practice in Georgia, he or she must have passed the American Nurses Association national examination for nurse practitioners. N.P.s practice according to guidelines and protocols established between themselves and doctors of their choosing; their job descriptions and duties

may change as the physician with whom they work deems it appropriate to the particular needs of himself or herself and the nurse practitioner. Plaintiffs in this case have protocols for ninety different ailments or examinations. Each protocol, approximately 1½ pages on average, lists a description and etiology (causation) of the ailment, subjective findings, objective findings, assessment procedures, and a plan of action to be followed.

No evidence showed that anyone at the Health Service intended to restrict the employment of physician's assistants to men only. Plaintiffs adduced evidence that Dr. Curtis once commented about stereotyping of physician's assistants and nurse practitioners as being similar to that of clinical psychologists and psychiatric social workers, but the Court discounts that as an indication of any gender-based discriminatory intent.

Plaintiffs complain that they were denied the opportunity to take "night call," like Mr. Curran, in rotation with the physicians. The evidence showed that they never sought night call; instead, they were vexed that Curran's participation in the rotation was used as a justification for his higher salary. Credible testimony established that plaintiffs were not sufficiently trained to take call. Even Dr. Phillips, who directed plaintiffs' N.P. training, stated that they could not take call because of their inability in the areas of trauma management, suturing, and other minor surgical skills. Plaintiffs, who had little or no training in trauma management, suturing, or assessment of bone X-rays (except sinus), argue that they should have been trained in those areas; credible testimony of several physicians qualified as experts, however, revealed that spot training in those fields would not be adequate.

There are three physician's assistants currently employed at the Health Service. One is a woman. Although plaintiffs argued that physician's assistants evolved from the originally "male" role of army

---

**2.** It appears that nurse practitioners may seek certification as physician's assistants if they obtain state approval of their training program or

receive approved refresher training and testing. Off.Code Ga.Ann. § 43–34–103(a)(2); Ga.Admin. Comp. 360–5–.03(1).

medic, no barriers have thwarted entry of women into the field. Women have averaged 40% of the students entering the P.A. training program at Emory University in Atlanta, for example (the program apparently nearest to Athens and the Health Service), between 1976 and 1984; since 1982 women have constituted a majority of each entering class.

Plaintiffs claim that defendants retaliated against them in six different ways after their complaint was filed. They assert that they received especially low raises; that defendants eliminated nurse practitioner positions and added physician's assistants; that defendants refused plaintiffs' request for suturing training courses; that defendants failed to appoint plaintiffs to committees; that a proposed new job description for nurse practitioners was rejected; and that defendants refused to accommodate plaintiff Hanson's desired part-time work schedule when she returned from maternity leave.

Annual raises were established for fiscal year 1982 about two months after this suit was filed. Salary increases at the University of Georgia, for both classified employees and faculty, customarily include a certain percentage increase which is fixed as a "cost of living" increment, plus an additional percentage, usually larger, to be allocated to employees based upon perceived merit in their performance of their work. Pay raise recommendations (which must collectively be within the overall constraints of the monetary allocations made available for raises by the Board of Regents) emanate from the employees' direct supervisor who is ordinarily in the best position to assess the employees' performance. The work performance of all plaintiffs was directly evaluated by their immediate supervisor, Nelle Shehane, who relied upon written performance evaluations and her day-to-day perceptions to make the initial salary increase recommendation for each of the plaintiffs. Shehane's recommendations went to the Director of Nursing, and from her to defendant Warren Loar, Assistant Director for Administration of the University Health Service, and finally to the Director, Dr. Curtis.

In 1981, the average Regents' salary increase (including both the discretionary merit portion and the fixed cost of living increment) was 10½%. The record shows data for only five of the six plaintiffs. Beall, Eicher, and Jacobson received 10½% salary increases; plaintiffs Bancroft and Hansen each received only 10%. Two other nurse practitioners who are not parties to this action received a higher increase, 11½%. On the other hand, another nurse practitioner who was also not a party to this case, and indeed who even testified for defendants in this case, received only a 10% salary increase for fiscal year 1982. That fact, combined with testimony that neither Mr. Loar nor Dr. Curtis modified the recommended salary increases as they came from the Department of Nursing that year and that they had not sought to lower the raises of plaintiffs, causes the Court to conclude that no retaliation occurred with respect to salaries.

Among other types of retaliation claimed by plaintiffs were staffing decisions by the Health Service to employ additional physician's assistants (male and female) and to convert a vacant nurse practitioner position to a registered nurse position. It is not disputed that vacant positions have in a number of instances been reassigned to other health care or medical service provider classifications. Evidence showed that Mr. Curran's appointment as a physician's assistant followed an inability of the Health Service to fill a vacant physician's position. In the fall of 1983, two vacant nurse practitioner positions were merged and an additional physician's position was created and filled by a woman.

Although Dr. Curtis, as Director of the University Health Service, was named as a defendant in connection with plaintiffs' retaliation claims, he was qualified as an expert witness, without objection, both in medicine generally and specifically with respect to operation of college and university health facilities.[3] As Director of the

---

**3.** Dr. Curtis has served as President of the American College of Health Association; he has been

a consultant to a number of college and univer-

Health Service, Dr. Curtis is responsible for staffing decisions; to carry out his responsibility, he is required to be familiar with different levels of medical knowledge, skill, and expertise needed for different functions in the Health Service. The Court finds Dr. Curtis to be a sincere and credible witness, and his staffing decisions involved an exercise of medical judgment notwithstanding his acknowledgement of irritation concerning the lawsuit and evidence of occasional statements by him that plaintiffs found offensive. The evidence shows that Dr. Curtis has in fact attempted on numerous occasions to win higher salaries for nurse practitioners in the Health Service. The Court concludes that no retaliation occurred with respect to staffing decisions.

Plaintiffs also claim retaliation in the denial of their request in May, 1981 (after the suit was filed) to attend a one-day suturing workshop at Health Service expense. Plaintiff Beall testified that Dr. Curtis denied the request on the ground that the workshop was not relevant to plaintiffs' area of practice; Dr. Curtis in fact had reservations about the legality of performance of surgical procedures, including suturing, by nurse practitioners. Plaintiff Beall also testified that Dr. Curtis stated that in any event he could not permit all plaintiffs to be away from the clinic at that one time. He was willing to allow one plaintiff to attend the conference at her own expense.

Dr. Curtis did not dispute these facts. As he explained, in his medical judgment plaintiffs did not have adequate training in basic medical science necessary for real competence at suturing. The Court finds that his decision constituted neither gender discrimination nor retaliation.

While plaintiff Beall concedes that she has served on the Pharmacy and Therapeutics Committee in the past and is currently on the Research Committee, and while evidence that all plaintiffs have served on committees is undisputed, some plaintiffs contend that the lack of committee assignments during the year following the filing of this action constituted retaliation. No evidence was introduced to show how many standing committee assignments would ordinarily be available or whether there would be anything unusual about some or even all plaintiffs' not having a committee assignment for any given year. Dr. Curtis commented that most physicians thought it to be retaliation when he *did* make them serve on a committee. He stated that to the best of his knowledge he never turned down a committee request from anyone, and that, to the best of his recollection, when plaintiff Beall complained about not being on a committee she was immediately placed on one. Dr. Curtis unequivocally denied that he has ever vetoed any committee assignment because of gender or because of participation in this suit. There was no contrary evidence with respect to either Dr. Curtis or Mr. Loar, who are the sole defendants with respect to plaintiffs' retaliation claims. Accordingly, the Court finds no retaliation in committee assignments.

In 1980, before this suit was filed, plaintiffs attempted to obtain a higher salary classification from the Personnel Services Division of the University of Georgia by proposing a new job description. Mr. Loar supported this effort, advising plaintiffs that he thought this might be a way of raising their salaries, which he and Dr. Curtis favored. The new job description proposed by plaintiffs was in fact approved by the Health Service and forwarded to the Personnel Services Division. The Personnel Division decided that the duties and responsibilities as rewritten fell within the existing classifications. Because this occurred before suit was filed, the action cannot have been retaliation; in any event, there is no evidence that either of the individual defendants alleged by the complaint to have retaliated against plaintiffs was in fact responsible for the rejection of plaintiffs' proposal, and the Court finds no retaliation as to the job description proposal.

sity health care facilities, including the University of Massachusetts, Southern Methodist University, the University of Kentucky, the University of North Carolina, and Clemson University.

■ The final claim of retaliation concerns plaintiff Hanson individually. She claims that, before her return to work at the Health Service after childbirth, she was intimidated by a phone call that informed her that the Health Service administration was going to try to keep her from getting her job back. The phone call was from plaintiff Beall. No such threat was attributed directly to defendants. Charges of retaliation cannot be based upon what one plaintiff says to another plaintiff.

When she decided to return to work, plaintiff Hanson requested part-time work during mornings. Because there was no difference in work load between mornings and afternoons, but a substantial one between Mondays and Wednesdays and the rest of the week, Mr. Loar determined that it would be better for Hanson's half-time work to be on Mondays and Wednesdays with a weekend shift every other weekend, with an arrangement for her to take longer lunch hours in order to go home and feed her child. As an alternative, Loar gave Hanson the option of returning on an hourly basis, working those hours that she felt convenient. She declined that offer. Dr. Curtis had no involvement in this matter.

There is no evidence that the litigation had anything to do with the scheduling of Hanson's work. The schedule followed her previous pattern of employment on a reduced basis: before having her child she worked three full days during the week, from 3 p.m. to 11 p.m. on Sundays, and every other weekend. The Court therefore finds no retaliation concerning plaintiff Hanson's schedule.

## CONCLUSIONS OF LAW

Plaintiffs allege that defendant Board of Regents has discriminated against them in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), by compensating them at a lower rate than the male physician's assistant who performs substantially equal work. Plaintiffs also claim discrimination by defendant Board of Regents on the basis of gender in the intentional segregation of jobs at the Health Service and in the effects of job classification, and by defendants Curtis and Loar in actions to retaliate for this suit, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Before addressing the applicable federal civil rights statutes that control the Court's decision in this case, it is well to define precisely what is and what is not at issue. This case does not concern the relative education, knowledge, competence, and skills of nurse practitioners and physician's assistants in general, either nationally or in Georgia. "These issues must be decided on a case-by-case basis under the facts of each case. They cannot be decided on an industry-wide basis." *Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256, 1258 (5th Cir.1972).

Nor does this case involve a class consisting of *all* nurse practitioners presently or previously employed at the UGA Health Service. At issue is a comparison of the respective medical education, knowledge, competencies, skills, and functioning of the six individual plaintiffs in this case—all licensed registered nurses who have been certified as "nurse practitioners" by the Georgia Board of Nursing—with the first certified "physician's assistant" to be employed at the Health Service and whose employment at a substantially higher salary gave rise to this lawsuit.

This case also does not involve the question whether plaintiffs' salaries are as high as they ought to be or whether the disparity between their salaries and the salary of the physician's assistant is too great.

*Equal Pay Act Claims*

The relevant portion of the Equal Pay Act, 29 U.S.C. § 206(d)(1), provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed

under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex. . . .

As the Fifth Circuit explained,

A prima facie Equal Pay Act case requires a showing that the "employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). To establish "equal work," the employee need not prove that the duties performed are identical, but merely that the "skill, effort and responsibility" required in the performance of the jobs is "substantially equal." *Brennan v. City Stores, Inc.,* 479 F.2d 235, 238–39 (5th Cir.1973). *See* 29 CFR § 800.122 (1977).

*Pearce v. Wichita County, City of Wichita Falls, Texas, Hospital Board,* 590 F.2d 128, 133 (5th Cir.1979). The court of appeals, drawing upon regulations published by the Secretary of Labor,[4] explained the criteria for equality of work:

"Skill includes consideration of such factors as experience, training, education, and ability." 29 CFR § 800.125 (1977).

*Pearce,* 590 F.2d at 133.

"Effort is concerned with the measurement of the physical or mental exertion needed for the performance of a job." 29 CFR § 800.127 (1977). *See Hodgson v. Brookhaven General Hospital,* 436 F.2d 719, 725 (5th Cir.1970).

*Id.*

"Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 CFR § 800.130 (1977). Although job titles are entitled to some weight in the

assessment of comparative responsibility, "[t]he controlling factor under the Equal Pay Act is job content—the actual duties that the respective employees are called upon to perform." *Brookhaven General Hospital,* 436 F.2d at 724.

*Id.*

"[T]he element of working conditions encompasses two subfactors: 'surroundings' and 'hazards.' " *Corning Glass Works v. Brennan,* 417 U.S. [at 202, 94 S.Ct. at 2231].

*Id.* at 133 n. 6.

█ When a plaintiff establishes a prima facie case, the burden shifts to an employer to prove that the unequal pay was due to one of the Equal Pay Act's four exceptions: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. at 2229; *Pearce,* 590 F.2d at 133–134. The first three exceptions are specific. The fourth is much broader:

The fourth affirmative defense of the Equal Pay Act . . . was designed differently, to confine the application of the Act to wage differentials attributable to sex discrimination. Equal Pay Act litigation, therefore, has been structured to permit employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of "other factors other than sex." Under the Equal Pay Act, the courts and administrative agencies are not permitted to "substitute their judgment for the judgment of the employer . . . who [has] established and applied a bona fide job rating system," so long as it does not discriminate on the basis of sex.

*County of Washington v. Gunther,* 452 U.S. 161, 170–71, 101 S.Ct. 2242, 2248–49, 68 L.Ed.2d 751 (1981) (citations and footnote omitted). The Supreme Court has made it clear that "market forces" do not legitimately constitute an "other factor oth-

---

**4.** The court noted that, although those regulations were not binding upon the courts, they

should be given great weight. *Pearce,* 590 F.2d at 133 n. 7.

er than sex" that justifies different wages for persons of different genders. *Corning Glass Works*, 417 U.S. at 205, 94 S.Ct. at 2233; *see also Brennan v. Victoria Bank and Trust Co.*, 493 F.2d 896, 902 (5th Cir. 1974).

■ Applying those legal standards to the evidence adduced at trial, the Court concludes that plaintiffs did not establish a prima facie Equal Pay Act claim. The evidence clearly shows that Curran possesses skills, by virtue of his experience, training, education, and ability, that plaintiffs have not acquired, particularly in the treatment of trauma. The Court is impressed by the assessment by Dr. Curtis and other physicians at the Health Service of the relative skills of Mr. Curran and plaintiffs. That assessment is buttressed by the credible opinion of Ms. Johnson, a nurse practitioner who works with plaintiffs and Mr. Curran, and by other documentary and testimonial evidence of the training and ability of Mr. Curran compared with those of plaintiffs.

Plaintiffs' chief expert, Dr. Pickard, called Mr. Curran's extra skills a "superfluous, expensive redundancy," and plaintiffs argue that the Court must compare skills actually required and used on the job rather than skills that create merely hypothetical differences in job performance.

"[A] wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task." *Marshall v. Dallas Independent School District*, 605 F.2d 191, 195 (5th Cir.1979); *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256, 1258 (5th Cir.1972). As the court of appeals explained in *Golden Isles*, "this approach requires examination of equal work claims in the light of practice in the particular employment." 468 F.2d at 1258.

In the medical field the availability of skills not often used is an important component of competence, and it is an important consideration in staffing decisions. Although the practices of physician's assistants and nurse practitioners at the Health Service overlap to a large extent, so do the

practices of the mid-level practitioners and physicians; but no claim can be seriously advanced to say that the mid-level practitioners and physicians deserve the same pay. The Court considers an analogy to the function of a security guard to be appropriate. A security guard is rarely—one hopes never—called upon to use a weapon; but when a weapon is required, he or she must have the skill to use it. Likewise, even if Mr. Curran's skills are seldom used, whether that is because patients needing those skills rarely appear at the Health Service, or consult physicians there instead, or are immediately referred to an outside hospital, they are relevant to distinguish his work from that of plaintiffs.

Nor does the Court consider Mr. Curran's superiority in management of trauma to be offset by the greater experience of some plaintiffs in gynecological care. The Court acknowledges that experience can compensate for some lack of training. The evidence in this case showed that Mr. Curran, with more exposure to the practice, would quickly become adept at gynecological care. On the other hand, credible evidence showed that experience alone, or even short-term training, would not suffice to bring plaintiffs to Mr. Curran's level of competence in certain areas of trauma treatment. The Court therefore concludes that the jobs of plaintiffs and of Mr. Curran did not require substantially equal skill.

Likewise, the responsibilities of the jobs were not substantially equal. This follows in part from the conclusion that the jobs required different skills, because in medicine the degree of accountability and the importance of the job obligation depend upon the expected available skills of a practitioner. There are other considerations, however, that show Mr. Curran's responsibility to be greater than that of plaintiffs. Most important of these is Mr. Curran's responsibility to take night call in rotation with the physicians. Plaintiffs claim that, by denying them the same opportunity to take night call, defendants engaged in illegal discrimination. That claim falls within Title VII (and will be addressed separately), not under the Equal Pay Act. The

evidence shows that Mr. Curran has had the additional responsibility of night call, and that fact requires the conclusion that the jobs of plaintiffs and of Mr. Curran are not substantially equal.

Although evidence at trial did not address the issues in detail, the Court concludes that the jobs of Mr. Curran and of plaintiffs were substantially similar in terms of effort and working conditions. Nevertheless, the differences in skill and responsibility preclude plaintiffs from making a prima facie case.

Even though plaintiffs failed to establish a prima facie case, the Court will evaluate the defenses asserted by defendant Board of Regents.

There is no question of a valid seniority system or merit system affecting the pay of mid-level practitioners at the Health Service. Defendant Board of Regents claims that quantitative and qualitative differences in the practices of plaintiffs and Mr. Curran establish a valid defense under 29 U.S.C. § 206(d)(1)(iii), and that market forces and governmental regulation constitute legitimate "other factor[s] other than sex" offering a defense under 29 U.S.C. § 206(d)(1)(iv).

 The claim that quantitative and qualitative differences in work justify a pay differential fails because plaintiffs showed that there was no *system* of adjusting pay for those factors. Only a system qualifies as a defense under 29 U.S.C. § 206(d)(1)(iii); mere incidental differences are not relevant.

 Nor does any influence of "market forces" alone justify pay differentials. The Equal Pay Act was intended to counteract those market forces that placed a different value upon the work of persons of different genders. "Congress enacted the Equal Pay act '[r]ecognizing the weaker bargaining position of many women and believing that discrimination in wage rates represented unfair employer exploitation of this source of cheap labor.'" *Corning Glass Works*, 417 U.S. at 206, 94 S.Ct. at 2233 (quoting decision below, 474 F.2d 226, 234 (2d Cir.1973)). Only if the market forces accord different values because of

"other factor[s] other than sex" may they be relied upon as a defense; as a result, market forces themselves have no intrinsic value in Equal Pay Act analysis. To the extent market forces recognize inherent differences in jobs, those differences themselves must be examined.

Defendant Board of Regents relies upon the scheme of state regulation, which differentiates physician's assistants and nurse practitioners, as a defense under the Equal Pay Act. As noted in the findings, physician's assistants are recognized by statute, Off.Code Ga.Ann. §§ 43–34–100 to –108, and are subject to regulations of the Composite State Board of Medical Examiners, Ga.Admin.Comp. ch. 360–5 (1982). Nurse practitioners are not recognized as such in the statutes governing nursing, *see* Off. Code.Ga.Ann. §§ 43–26–1 to –39; they are recognized in, and regulated by, a rule of the Georgia Board of Nursing, Ga.Admin. Comp. 410–12–.01 (1984).

The different systems of regulations are similar. Both require physician supervision of mid-level health care professionals. Both involve performance of medical functions. Both provide for some type of authoritative written guidelines setting forth the powers of the mid-level health care providers.

 Despite the many similarities, there is one important difference which affords defendants a valid defense. A physician's assistant may perform "any functions performed by the applying physician which the physician's assistant is qualified to perform." Off.Code Ga.Ann. § 43–34–103(d). Thus, even though the practice of a physician's assistant is normally limited to the powers contained in the job description upon which his or her certification is based, the job description is not absolutely binding. Even if the job description were binding, Mr. Curran's job description lists, under "therapeutic duties", the duty to "[p]erform all functions as dictated by demonstrated education and competency as directed by and under the supervision of the physician."

No similar provision exists for plaintiffs. To the contrary, a rule of the Georgia

Board of Nursing states that a nurse practitioner "must ... practice according to written protocols mutually agreed upon by the Nurse Practitioner and physician for all delegated medical functions." Ga.Admin. Comp. 410–12–.01(5). The protocols governing the practice of plaintiffs at the Health Service clearly state at the outset that "[i]f there is no guideline defining a condition and its management, the nurse practitioner must not diagnose or treat the condition without direct physician involvement."

As a result, Mr. Curran's professional status, as recognized by statute and regulations, makes his job different from those of plaintiffs. He can legally perform medical treatment beyond the written confines of specifically enumerated powers, as long as he has the education and competence necessary to do so. Plaintiffs cannot. No matter how well trained, no matter how able, nurse practitioners are confined by their guidelines and protocols. Their practice is less flexible, and they may not lawfully perform some medical services that Mr. Curran is entitled to perform.

Plaintiffs argue that, because the State of Georgia has, in its merit system, treated nurse practitioners and physician's assistants alike, the Court must or may ignore these legislative and regulatory distinctions. Although an employer, even another unit of the state, may employ nurse practitioners and physician's assistants in the same capacity, the Court has heard no adequate reason to conclude that the classifications are improper or insignificant and may not be relied upon. The Court therefore concludes that the pattern of state regulation indeed constitutes an "other factor other than sex" that creates a defense for the employer under 29 U.S.C. § 206(d)(1)(iv).

■ Because the Court concludes that plaintiffs have failed to establish a prima facie case and that, in any event, defendant Board of Regents has created a pay differential based upon a legitimate "other factor other than sex," the Court determines that defendant Board of Regents prevails on plaintiffs' Equal Pay Act claim.[5]

*Title VII Claims*

Title VII of the Civil Rights Act of 1964, at 42 U.S.C. § 2000e–2(a), states:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Plaintiffs' Title VII claims include alleged intentional discrimination in pay, in employment opportunities (taking call), and in sex-segregated job classification. In addition, plaintiffs assert that, regardless of intention, the job classifications at the Health Service have an adverse effect upon women. Finally, plaintiffs argue that defendants Curtis and Loar retaliated against them for filing suit.

■ 42 U.S.C. § 2000e–2(a) has given rise to two distinct types of Title VII actions, involving "disparate treatment" or intentional discrimination, and "disparate impact" (or "effect"). The basis of "disparate treatment" claims, normally associated with actions by individuals (as opposed

---

5. Having decided that there are important differences between Mr. Curran's job and those of plaintiffs, the Court will not consider how much more Mr. Curran should have been paid. To postulate some "appropriate" wage differential as a standard to judge the wage pattern at the Health Service is beyond both the authority and the competence of the Court. *See Plemer v. Parsons-Gilbane,* 713 F.2d 1127, 1134 (5th Cir. 1983).

to a class), is that the employer intentionally discriminated against the plaintiff for prohibited reasons (*i.e.*, race, color, religion, sex, or national origin). *E.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Proof of discriminatory motivation is critical to a "disparate treatment" case. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Pouncy v. Prudential Insurance Company of America*, 668 F.2d 795, 802 (5th Cir.1982).

■ In "disparate impact" (or "effect") cases, the showing of an employer's intent to discriminate is unnecessary. Normally associated with class actions, "disparate impact" cases rest upon a showing that a practice or classification used by the employer, although neutral on its face and in intent, in fact has a discriminatory effect upon particular groups or classes of employees. As the Supreme Court has stated, "The Act was designed to bar not only overt employment discrimination, 'but also practices that are fair in form, but discriminatory in operation.'" *Pullman-Standard v. Swint*, 456 U.S. 273, 276, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)).

### Disparate Treatment

■ Wage discrimination is forbidden under Title VII as well as the Equal Pay Act. Although the standards under the two laws are similar, Title VII is in some respects broader: a Title VII plaintiff is not required to meet the exacting burden of showing substantial equality of jobs. *County of Washington v. Gunther*, 452 U.S. 161, 170–71, 181, 101 S.Ct. 2242, 2248–49, 2253, 68 L.Ed.2d 751 (1981).

■ The standards and burdens of proof in a Title VII disparate treatment action have been established and clarified by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67

L.Ed.2d 207 (1981). Those standards are flexible, to accommodate the particular type of Title VII action presented.

■ To establish a prima facie case of intentional wage discrimination and job segregation under Title VII, plaintiffs must show that (1) they are members of a protected class (2) who occupy a sex-segregated job classification (3) that is paid less than (4) a sex-segregated job classification occupied by men and (5) that the two job classifications involve work that is similar in skill, effort, and responsibility. *Briggs v. City of Madison*, 536 F.Supp. 435, 443 (W.D.Wis.1982).

■ If a prima facie case is made, a defendant then has the burden of coming forward to articulate a legitimate, non-discriminatory reason for the difference in compensation. If that is done, plaintiffs have the burden of showing that the justification proffered by defendant is merely pretextual. Defenses listed in the Equal Pay Act have been incorporated in Title VII by the Bennett Amendment, 42 U.S.C. § 2000e–2(h). *See Gunther*, 452 U.S. at 170–171, 101 S.Ct. at 2248–49.

■ Plaintiffs are members of a protected class, and they are paid less than physician's assistants. Because women compose 97% of the nurse practitioners in Georgia, that classification has historically been sex-segregated. Three elements of a prima facie case have therefore been met. On the other hand, the Court concludes that the job classification of physician's assistants is not sex-segregated. Almost one-third of physician's assistants in Georgia are women; the proportion of women in P.A. training programs has risen steadily since their inception, and women now are a majority of P.A. students in some training programs. Furthermore, as explained in consideration of the Equal Pay Act claims, the Court cannot conclude that the classifications of nurse practitioner and physician's assistant at the Health Service involve work that is similar in skill and effort. As a consequence, the Court concludes that plaintiffs have failed to make a prima facie case of intentional wage or job-classification discrimination.

■ Plaintiffs' claim that they were refused the opportunity to take call may be construed as a claim of discrimination in hiring or promotion. To establish a prima facie case of discrimination in hiring or promotion, plaintiffs must establish that (1) they are members of a protected class; (2) they applied for a job for which the employer was seeking applicants; (3) despite their qualifications, they were rejected; and (4) after their rejection, the position remained open and the employer continued to seek applicants from persons of their qualifications. *Cf. Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1130–1131 (11th Cir.1984) (racial discrimination); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (same). Plaintiffs may also make out a prima facie case, where they were given no opportunity to apply for a job, by establishing that their employer had some reason or duty to consider them for the post. *Cf. Carmichael*, 738 F.2d at 1133–1144.

■ As noted earlier, plaintiffs belong to a protected class. On the other hand, the evidence showed that they did not apply to take call; that the Health Service had no reason or duty to consider them to take call, because its physicians made a *bona fide* determination that plaintiffs were not qualified to take call; and that the Health Service sought for the call rotation persons with qualifications superior to those of plaintiffs. The Court therefore concludes that plaintiffs failed to establish a prima facie case of intentional discrimination in the denial of employment opportunities.

■ Even if plaintiffs had established a prima facie case of intentional discrimination under Title VII, they have not overcome, or shown to be pretextual, the defense based upon the legislative and regulatory classifications of N.P.s and P.A.s discussed above in connection with the Equal Pay Act claims. As a result, plaintiffs' claim of intentional discrimination in violation of Title VII fails.

## Disparate Effect

Where a "disparate effect" is alleged, to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement [has] ... a manifest relationship to the employment in question." If the employer proves that the challenged requirements are job-related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'"

*Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977) (quoting *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854, and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975)).

■ Although plaintiffs have asserted a "disparate effect" claim, this case is not amenable to disparate effect analysis. As the Fifth Circuit has noted,

The disparate impact model applies only when an employer has instituted a specific procedure, usually a selection criterion for employment, that can be shown to have a causal connection to a class based imbalance in the work force.

*Pouncy v. Prudential Insurance Co.*, 668 F.2d 795, 800 (5th Cir.1982). Plaintiffs must show a "significantly adverse" effect based upon gender. *Id.* Considering the employment of Mr. Curran alone, or of all three physician's assistants eventually employed at the Health Service (one of whom is a woman), the Court cannot determine whether there is a class-based imbalance, simply because there is no class large enough to yield significant statistics.[6] The

---

**6.** If the Court were to consider statistics concerning a class of either one or three P.A.s, the results would defeat plaintiffs' claim. The likelihood of having a man as the sole P.A. is 50%; of having two or more men among three P.A.s, also 50%.

Court therefore concludes that plaintiffs have failed to prove a disparate effect claim under Title VII.

*Retaliation*

Plaintiffs' final claim under Title VII concerns alleged retaliation by defendants Curtis and Loar. 42 U.S.C. § 2000e–3(a) states:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he [the employee or applicant] has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

In order to prove retaliation, a

plaintiff must establish (1) that there was a statutorily protected participation, (2) that an adverse employment action occurred, and (3) that there was a causal link between the participation and the adverse employment action.

*Whatley v. Metropolitan Atlanta Rapid Transit Authority,* 632 F.2d 1325, 1328 (5th Cir. Unit B 1980).

 The filing of this suit constituted a statutorily protected participation. In light of the Court's factual findings concerning retaliation, however, the Court concludes that no adverse employment action occurred and that any event possibly construed as adverse action was not caused by the protected participation. As a consequence, plaintiffs' claim of retaliation fails.

Because plaintiffs have not prevailed on their claims under the Equal Pay Act or under Title VII of the Civil Rights Act of 1964, the Court FINDS for defendants and DIRECTS that judgment be entered accordingly.