Karen **MIRANDA**, Plaintiff–Appellee,

v.

**B & B CASH GROCERY STORE,
INC.**, Defendant–Appellant.

Karen **MIRANDA**, Plaintiff–Appellant,

v.

**B & B CASH GROCERY STORE,
INC.**, Defendant–Appellee.

Nos. 91–3295, 91–3338.

United States Court of Appeals,
Eleventh Circuit.

Oct. 28, 1992.

Gregory A. Hearing and Thomas M. Gonzales, Tampa, Fla., for B & B Cash Grocery Store.

Douglas L. Gross, Tampa, Fla., for Karen Miranda.

Before KRAVITCH and DUBINA, Circuit Judges, and RONEY, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

This case consists of two consolidated appeals resulting from a lawsuit filed by Karen Miranda Hopewell ("Miranda" or "plaintiff") against B & B Cash Grocery Store, Inc. ("B & B" or "defendant"), alleg-

ing gender-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Equal Pay Act of 1963, 29 U.S.C. § 206 ("Equal Pay Act"). Miranda also filed a claim under Florida law for intentional infliction of emotional distress. The action was referred to a Magistrate–Judge pursuant to the parties' consent and referral from the District Court. *See* 28 U.S.C. § 636(c).

Defendant moved for partial summary judgment on plaintiff's claims grounded in the Equal Pay Act and Florida tort law. The Magistrate–Judge granted defendant's motion on both counts, holding that the plaintiff did not sustain her burden of establishing a *prima facie* case of sex-based wage discrimination under the Equal Pay Act.[1] The Magistrate–Judge held a bench trial on the claims under Title VII, found that the defendant had discriminated against Miranda on the basis of her sex, and awarded the plaintiff backpay in the amount of $52,765.83.

Miranda appeals the grant of summary judgment to the defendant on her Equal Pay Act claim; B & B cross-appeals the finding of sex-based discrimination under Title VII. For the reasons discussed below, we REVERSE the Order of the Magistrate granting summary judgment to the defendant under the Equal Pay Act, AFFIRM the judgment in favor of the plaintiff under Title VII and the damages awarded to her, and REMAND to the district court for a trial on the Equal Pay Act claim.

### Facts[2]

B & B Cash Grocery Stores, Inc. is a family-owned business of twenty-four supermarkets operating under the name of U–Save in central and southwest Florida.

In 1988, B & B's enterprise employed 1,900 workers.

Each store contains grocery, meat, produce, dairy and non-foods departments, with managers in charge of each department. The store management team consists of a fourth manager, third manager, assistant manager and store manager. Each store also employs a head cashier, cashier, "stock boy" and "bag boy."[3] To become a store manager at B & B, one normally progresses from stockboy or bag boy to third and fourth manager, and assistant manager. Only two women have ever become store managers and they both came up through the cashier or head cashier's position.

Buyers work out of the main office in downtown Tampa and have responsibility for buying either grocery, meat, dairy or non-food items for all of the stores. A separate buyer works with vendors who sold such items as soft drinks, bread, soda, wine and beer directly to the stores. The buyers are responsible for meeting with vendors, maintaining appropriate inventories of items assigned to them, replenishing supplies, and ordering new items. Except for Miranda, all of B & B's buyers have some experience in store management.

Miranda began working at U–Save in June, 1976, as a part-time cashier while she was still in high school. After approximately six months, she became a full-time cashier. From 1976 through April, 1979, Miranda worked at various U–Save grocery stores in the Tampa area, progressing from cashier, to head cashier, and then to non-foods manager. In this last position, her work included stocking shelves in the non-foods area (including "health and beauty aids" and "housewares") and performing various office duties, including depositing checks.

---

**1.** Plaintiff does not appeal the grant of summary judgment for the defendant on the claim of intentional infliction of emotional distress and that ruling is not a subject of this opinion.

**2.** These facts are drawn from the Findings of Facts detailed in the Magistrate's thorough and well-reasoned Order.

**3.** Testimony by B & B management consistently referred to these positions in gender-specific terms. Fourth and third managers were also referred to as fourth and third "man."

Plaintiff was transferred to the accounting department at her request in late April, 1979, and worked there for several months logging expenses for the individual stores. She was subsequently offered a transfer to the bookkeeping department, a position she accepted and kept for approximately two years.

In February, 1982, James E. Duffy, B & B's grocery buyer and warehouse and distribution director, offered Miranda a job as an inventory control clerk. The position involved working at Duffy's direction processing buyer orders, forwarding information to store managers or brokers, cross-checking inventory received with the invoices, and back-ordering when necessary, as well as performing secretarial duties.

In approximately July, 1984, plaintiff began to assume some buying duties along with her responsibilities as inventory control clerk. Initially, she took over the responsibility of purchasing cigarettes and tobacco products, which at least two of Duffy's previous secretaries had done. Later, Duffy assigned her candy products to buy and allowed her to buy items in accordance with a weekly re-order system when he was out of the office. The trial court found that Miranda received considerable on-the-job training working with Duffy, including learning his system of buying, which included computer generation of buying forms to assist in the buying process. She attended sales presentations and reviewed written sales proposals, providing comments to Duffy. B & B management was largely unaware of the extent of Miranda's buying responsibilities and the training she received while working for Duffy.

Duffy resigned from B & B in June, 1986. He told Miranda that he would recommend that she succeed him as grocery buyer at a salary comparable with what the other buyers were paid. The president of B & B, C.C. Bever, Jr., decided to split Duffy's grocery buyer job into two separate positions and add an assistant dairy buyer position. Miranda was offered one of the grocery buyer positions, and Donald Kelley, a store manager, was offered the other.

Duffy had been paid approximately $600.00 per week as a grocery buyer, and had also received a "salary adjustment" at the end of the year.[4] Miranda assumed that she would receive a comparable salary, but instead Bever told her that her starting salary would be $400.00 per week, which was only $34.00 more than she had earned as an inventory control clerk working for Duffy. When plaintiff told Bever that he could not hire a buyer for that position at that salary, Bever replied that "any third man would be astounded to hold the title that I am giving you." (Tr. I at 42).[5] At trial, Bever explained the salary disparity between Miranda and the other buyers as

4. All buyers received a year-end annual bonus referred to as a "salary adjustment," which was actually paid in the following year. The trial court found that it was unclear what factors B & B relied upon in determining the amount of salary adjustment its buyers were due. The defendant generally paid its employees the same hourly rate or weekly draw according to job classification, but the salary adjustment within a given job category could vary according to factors that, the Magistrate found, "were never clearly articulated and which appear vague and somewhat arbitrary." *Miranda v. B & B Cash Grocery Store, Inc.*, (88–1735–CIV–T–10C, M.D.Fla.), Jan. 2, 1991 [hereinafter "Order"], at 10. The year-end salary adjustment for the buyers for the period in question was as follows:

| | end–1986 | end–1987 |
|---|---|---|
| Don Kelley | $10,000* | $12,500 |
| Karen Miranda | $ 8,000* | $ 8,160 |
| Bob Edenfield | $10,000* | $12,500 |
| Dick Gossic | $20,800 | $20,800 |
| J.B. Bowden | $20,800 | $20,800 |
| Harold Tidwell | $24,650 | $24,650 |
| Linda Sholes | $ 4,000** | $ 5,820 |

\* promoted to buyer, July, 1986.
\*\* promoted to assistant buyer, July, 1986.

5. The "third man" position was a store-level position subordinate to the assistant manager and store manager positions.

due to budgetary constraints. All other buyers were paid between $600.00 and $650.00 per week.

The trial court noted that during the applicable period, in-house transfers to the position of buyer generally were considered lateral moves with little or no salary increase. However, prior to Miranda, no one had ever been become a buyer from an accounting, bookkeeping, or clerical position. Most buyers, including Don Kelley, who was named grocery buyer with Miranda, and Bob Edenfield, the new dairy buyer, had been store managers. Both Kelley and Edenfield received the same weekly draw as buyers that they had received as store managers: $625.00 per week. Linda Sholes, a clerical assistant to a former dairy buyer, was appointed an "assistant dairy buyer" and received a raise from approximately $366.00 per week as a clerical assistant to $390.00 per week.[6]

Miranda testified that although she was displeased with the salary offered to her, she agreed to accept the buyer position in July, 1986, because she thought the company would reevaluate her pay after she had a chance to prove herself at the job. In September, 1986, Miranda's weekly salary was increased from $400.00 to $420.00; it remained at this level until her buying job was eliminated and she left defendant's employment in July, 1988.

The trial court found that Miranda's job was similar to that of the other buyers employed by defendant except that the initial assignment of grocery buying duties between plaintiff and Kelley resulted in Miranda being assigned substantially fewer grocery items. Miranda was responsible for approximately one-third of the items; Kelley was responsible for approximately two-thirds. Kelley was also assigned a larger number of higher velocity (turnover) items to purchase, which was consistent with Bever's plan that Kelley handle the more difficult items because of his buying

experience as a store manager. Duffy, however, denied at trial that he intentionally gave Kelley more items or more responsibility. He testified that he simply roughly divided the number of vendors between the two buyers, a division that Miranda and Kelley would refine as necessary.

Plaintiff protested the unequal distribution of work, but the situation remained unchanged until approximately May 23, 1988. At that point, Harold Tidwell, who had replaced Duffy as head buyer, assigned her the additional items she requested. With the addition of these responsibilities, Miranda and Kelley had an approximately equal number of items to purchase. However, from the end of May, 1988, until her position was eliminated in July, 1988, Miranda never received a salary increase.[7]

The trial court found that during her tenure as a buyer, Miranda made several requests, both verbal and in writing, for her salary to be raised to the level that the other full buyers—all of whom were male—were receiving. Tidwell and Ben Phillips both told her that "something would be worked out"; Miranda was never told that the pay disparity would not remain uncorrected. However, plaintiff did suspect that the unequal treatment was due to sex discrimination and she mentioned this concern to her attorney at the time she accepted Bever's offer.

On July 25, 1988, Phillips, Tidwell, and Bever told Miranda that B & B could not afford two grocery buyers and that her position would be terminated effective the following Monday. Bever told her that they had a position available as head cashier at $8.00 per hour, but because she had no experience supervising people, a store manager or supervisory position was not available. Bever also told her that she had done an outstanding job, that she would be provided references if she decided to look elsewhere, and that with her youth and her ability, she should be able to find what she

---

**6.** Sholes was the only person to hold an "assistant buyer" position.

**7.** The fact that Miranda's purchasing responsibilities were increased in May of 1988 to bring her duties to the same level as Don Kelley's was

not presented to the Magistrate in Plaintiff's Response to Defendant's Motion for Summary Judgment. This fact became clear only during the bench trial on Plaintiff's remaining claims under Title VII.

wanted. Plaintiff refused the position as head cashier and terminated her employment with B & B. Ten weeks later she was hired as a buyer by Kash 'n' Karry, a competing grocery chain.

Linda Sholes, the assistant dairy buyer, was also terminated from her position in July, 1988. She was offered employment as an assistant to the office manager at the same salary she had received as an assistant dairy buyer: $390.00 per week. Sholes accepted the position.

The only two buyers whose positions were terminated were female. Five other B & B employees, all men, were demoted to positions they had occupied previously. Two supervisory positions occupied by men were eliminated and both workers returned to work as store managers. Neither, however, received a pay cut with the reassignment. In addition, four other men were demoted, but it is unclear whether they received a reduction in pay.

Within eight to ten months after Miranda's and Sholes' buyer positions were eliminated, Don Kelley's weekly salary increased from $625.00 to $750.00 per week, and many other executives received pay raises. The trial court noted, however, that these workers had not received any significant pay increases for approximately two years.

The trial court found as an undisputed fact that Miranda performed her job as a grocery buyer reasonably well. At the time that she took the job, she knew Duffy's system of ordering and the necessary paperwork better than anyone else in the company. She taught Kelley the computer format and the paperwork involved in the job. The plaintiff was formally evaluated only once, in 1988, at which point she received an "average" rating; Don Kelley was rated slightly "above average." B & B management testified, however, that they did not rely upon that evaluation in deciding to eliminate Miranda's position.

Miranda filed a charge with the Equal Employment Opportunity Commission (EEOC) in late July or early August, 1988, alleging violations of the Equal Pay Act and Title VII. She received a right-to-sue letter and filed suit in the Middle District of Florida in November, 1988, on the federal claims and a state-law claim of intentional infliction of emotional distress. After the parties completed discovery, B & B filed a Motion for Partial Summary Judgment on the claim arising under the Equal Pay Act and the state-law claim. Miranda opposed the motion, but the Magistrate granted summary judgment for the defendant on the tort claim and the Equal Pay Act claim. The court ruled that Miranda had not established a *prima facie* case under the Act because she had not demonstrated that her job and Don Kelley's were "substantially equivalent" and thus covered by the Equal Pay Act.

The parties appeal the following issues: (1) Miranda appeals the trial court's ruling in favor of the defendant's motion for summary judgment on the Equal Pay Act claim. Defendant B & B cross-appeals, claiming: (2) Miranda's wage discrimination claim under Title VII was barred by *res judicata* because the trial court ruled that Miranda had not established a *prima facie* case of wage discrimination under the Equal Pay Act; (3) Miranda's wage discrimination claim was barred by the statute of limitations; (4) the court misapplied the standard of wage discrimination encompassed in Title VII; (5) the trial court erred in the calculation of the award of damages to Miranda.

*Analysis*

I. *Introduction: Gender–Based Discrimination in the Workplace*

This case involves the application of two statutes passed by Congress to help eliminate gender-based discrimination in the workplace: The Equal Pay Act and Title VII. Miranda charges that B & B intentionally paid her less than male employees who performed substantially similar work and therefore violated both statutes. The trial court held that the plaintiff failed to establish a claim under the Equal Pay Act, but that she proved that B & B violated Title VII. The defendant contends, however, *inter alia,* that a finding that a plaintiff

has not presented a *prima facie* case of gender-based discrimination under the Equal Pay Act conclusively establishes that the plaintiff was not a victim of discrimination under Title VII. Thus, we must determine not only the individual applicability of each statute to B & B's actions, but the interaction between the two.

Gender-based discrimination in rates of pay to employees, whether male or female, is prohibited by the Equal Pay Act of 1963, which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206(d) (1976), as well as by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Equal Pay Act was directed only at wage discrimination between the sexes and forbids the specific practice of paying unequal wages for equal work to employees of the opposite sex.[8] Title VII, on the other hand, forbids discrimination on the basis of gender, race, or national origin in a wide range of employment practices, including hiring, firing, training, and promoting.[9] *See, e.g., Waters v. Turner,* 874 F.2d 797, 801 n. 10 (11th Cir.1989); *Beall v. Curtis,* 603 F.Supp. 1563, 1580 (M.D.Ga.), *aff'd without op.,* 778 F.2d 791 (11th Cir.1985). The legislative history of Title VII demonstrates that it was enacted primarily to counter racial discrimination; the prohibition against gender-based bias was added to the legislation at the last moment, and, according to some theories, in an effort to thwart passage of the Civil Rights Act.[10]

The burdens of proof are different under the two laws. A plaintiff suing under the Equal Pay Act must meet the fairly strict standard of proving that she performed substantially similar work for less pay. The burden then falls to the employer to establish one of the four affirmative defenses provided in the statute. Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the burden of proving an intent to discriminate on the basis of sex (or race or national origin).[11]

Under the Equal Pay Act, an additional amount equal to backpay may be awarded as liquidated damages unless the employer shows that the violation was in good faith. Title VII, on the other hand, provides for equitable relief. Thus, plaintiffs suing under Title VII generally are considered to have no right to a jury trial. *See Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527, 1529 n. 4 (11th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 353, 112 L.Ed.2d 317 (1990). The statute of limitations for backpay relief is also more gener-

---

**8.** The Equal Pay Act provides, in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

**9.** Title VII states, in relevant part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2.

**10.** *See, e.g., County of Washington v. Gunther,* 452 U.S. 161, 190 n. 4, 101 S.Ct. 2242, 2258 n. 4, 68 L.Ed.2d 751 (1981) (Rehnquist, J., dissenting).

**11.** We refer here only to the "disparate treatment" model of Title VII. Under some instances, plaintiffs can recover for the disparate impact of a defendant's facially neutral employment practices. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

ous under the Equal Pay Act than under Title VII. Further, the Equal Pay Act, unlike Title VII, does not require exhaustion of administrative remedies. *County of Washington v. Gunther*, 452 U.S. 161, 175 n. 14, 101 S.Ct. 2242, 2250 n. 14, 68 L.Ed.2d 751 (1981). In *Gunther*, the Supreme Court noted that these advantages may encourage plaintiffs to sue under the Equal Pay Act rather than Title VII. *Id.*

▮ Title VII and the Equal Pay Act exist side by side in the effort to rid the workforce of gender-based discrimination. Plaintiffs have two tools for relief, each of which provides different burdens of proof and may produce different amounts of compensation. If a defendant has both violated the Equal Pay Act and denied a woman a promotion because of her sex, the plaintiff may sue for relief under both statutes and is entitled to recovery for both injuries, if she satisfies the requirements of both laws. *See Jepsen v. Florida Board of Regents*, 754 F.2d 924 (11th Cir.1985) (noting that plaintiff, a female college professor denied a promotion for 21 years, had received double liquidated damages under the Equal Pay Act and an award for intentional sex-based discrimination under Title VII).

In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court held that Title VII was intended to "supplement, rather than supplant, existing laws and institutions relating to employment discrimination" and that "the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable federal statutes." *Id.* 415 U.S. at 46–49 & n. 9, 94 S.Ct. at 1019–20 & n. 9.[12]

## II. Gender–Based Wage Discrimination Under Title VII

▮ B & B contends that Title VII does not encompass a claim for sex-based wage discrimination and that Miranda can only bring her claim under the Equal Pay Act. Therefore, defendant argues, Miranda's failure to establish a *prima facie* case under the Equal Pay Act precludes her from bringing a claim under Title VII. This approach rests on the assumption that Title VII merely reiterates the intent of the Equal Pay Act, and goes no further. In *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Supreme Court explicitly rejected this interpretation.

In *Gunther*, the defendants argued that the Bennett Amendment to Title VII restricted the Civil Rights Act's prohibition of sex-based wage discrimination to claims for equal pay for equal work, the only disparity forbidden by the Equal Pay Act.[13] The court ruled otherwise, holding that the Bennett Amendment incorporated into Title VII only the affirmative defense of the Equal Pay Act, not its prohibitory language requiring equal pay for equal work. The Supreme Court noted that under the opposite reading,

> only those sex-based wage discrimination claims that satisfy the "equal work" standard of the Equal Pay Act could be brought under Title VII. In practical terms, this means that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay. Thus, if an employer hired a woman for a unique position in the company and then admitted that her salary would have been higher had she been male, the woman would be unable

---

**12.** The Court also noted that the Senate defeated an amendment that would have made Title VII the exclusive federal remedy for most unlawful employment practices.

**13.** The Bennett Amendment reads:
It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in deter-

mining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29 [the affirmative defenses to the Equal Pay Act].

42 U.S.C. § 2000e–2(h).

to obtain legal redress under petitioners' interpretation. Similarly, if an employer used a transparently sex-biased system for wage determination, women holding jobs not equal to those held by men would be denied the right to prove that the system is a pretext for discrimination.... Congress surely did not intend the Bennett Amendment to insulate such blatantly discriminatory practices from judicial redress under Title VII.

452 U.S. at 179, 101 S.Ct. at 2253. The Court also referred to its past interpretations of Title VII, which

"[prohibit] all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763 [96 S.Ct. 1251, 1263, 47 L.Ed.2d 444] (1976). As we said in *Los Angeles Dept. of Water & Power v. Manhart, supra*, [435 U.S. 702] at 707, n. 13 [98 S.Ct. 1370 at 1375, n. 13, 55 L.Ed.2d 657]: "In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."

*Id.*

The Court concluded that the Bennett Amendment did work a change on Title VII as it relates to sex-based wage discrimination because it incorporated the affirmative defenses from the Equal Pay Act. This incorporation would allow employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of "other factors other than sex." *See Corning Glass Works v. Brennan*, 417 U.S. 188, 198–201, 94 S.Ct. 2223, 2232–33, 41 L.Ed.2d 1 (1974). The Court, however, refused to elaborate on the respective burdens of proof for a gender-based wage discrimination claim under Title VII and the effect of the affirmative defenses incorporated via the Bennett Amendment. The issue re-

maining after *Gunther* is the method for establishing gender-based wage discrimination under Title VII, specifically whether the traditional Title VII method of proof or the framework established by the Equal Pay Act applies. The Supreme Court has not revisited this question since *Gunther*.

This is also an issue of first impression for the Eleventh Circuit. In *Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036 (11th Cir.1987), the plaintiff brought a claim of sex-based wage discrimination under Title VII, but because the parties had agreed in a pretrial stipulation that the burdens of proof and production would be governed by the *McDonnell Douglas/Burdine* framework, the court declined to reach the issue.[14] After considering the Supreme Court's decision in *Gunther*, and the legislative history of Title VII and the Equal Pay Act, we believe that the *McDonnell Douglas/Burdine* approach to disparate treatment is the appropriate framework for evaluating Miranda's claim of gender-based wage discrimination. *See Beall v. Curtis, supra.*

In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set out the shifting burdens of production and proof for determining whether or not the employer illegally discriminated against the employee. The plaintiff first has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. The burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the alleged discrimination. If the defendant produces such a reason, the plaintiff must then prove that the legitimate reason offered was a mere pretext for an illegal motive. *Id.* at 802, 93 S.Ct. at 1824.

*McDonnell Douglas* remains the model for disparate treatment cases, although in later opinions, the Supreme Court made clear that the burden of proof remains at all times with the plaintiff. *See Texas Dept. of Community Affairs v. Burdine,*

---

**14.** We note that the parties to this case stipulated that Title VII would guide the claim of discrimination in B & B's discharge of Miranda from her job as a buyer, but failed to discuss the principles guiding the wage-discrimination claim.

450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Although proof of discriminatory motive is critical, "it can in some circumstances be inferred from the mere fact of differences in treatment." *Internat'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

■■■ We agree with the trial court that Miranda carried her burden of proof and established that B & B discriminated against her because of her gender. The plaintiff establishes a *prima facie* case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males. The trial court found that Miranda's description of the type of duties she performed as a buyer, as well as testimony from defendant's witnesses established that she shared the same type of tasks as the other buyers.[15] The evidence demonstrated that the male buyers all received a weekly salary of $625 to $650 per week while the plaintiff received $400 to $420 per week. Accordingly, Miranda established a prima facie case of discrimination, thus shifting to the defendant the burden of producing a legitimate, non-discriminatory reason for the pay disparity. *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1095.

■■■ Defendant's burden of production in rebutting the *prima facie* case is "exceedingly light." *Perryman v. Johnson Products, Inc.*, 698 F.2d 1138, 1142 (11th Cir.1983). The trial court determined that B & B justified its decision to pay Miranda less than the other male buyers on the following:

1. The company's budget was limited and it paid the plaintiff all that it could afford for the new position when the grocery buyer position was split into two positions. (Tr. II at 112).

2. In-house promotions to grocery buyer were generally lateral transfers in terms of pay. (Tr. II at 133)

On the surface, these reasons appear legitimate, thus the burden returns to the plaintiff to establish by a preponderance of the evidence that the proffered justifications are actually a pretext for gender-based discrimination. In other words, Miranda must demonstrate that a discriminatory reason more likely than not motivated B & B to pay her less, or that B & B's explanation is not worthy of belief. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Caban–Wheeler v. Elsea*, 904 F.2d 1549, 1554 (11th Cir.1990).

■■■ The trial court found that the plaintiff bore her burden of demonstrating that B & B's explanation was a pretext for gender-based discrimination and that the defendant intentionally discriminated against Miranda. That determination is a finding of fact that is binding on this court unless clearly erroneous. *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Lincoln v. Board of Regents*, 697 F.2d 928, 940 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983).

We agree with the trial court's determination that the defendant's rationales for the disparity is "undercut by other evidence in the record and has been shown to be pretextual." The court noted that Miranda testified that she accepted the offer of the buyer's position at the stated pay of $400 (less than $25 a week more than her salary as a clerk) only because Bever, the President of B & B, promised to evaluate her within 30, 60, or 90 days because he was not familiar with her capabilities. However, no formal evaluation took place until nearly two years later. Further, Bever testified that although he knew within a matter of weeks that plaintiff could perform a buyer's job (Tr. II at 61), he did not adjust her pay to the scale that the company had traditionally paid its buyers—a range of $625 to $650. This wage disparity was repeated in the year-end salary adjustments paid to the buyers: In 1987, the first full year that plaintiff, Kelley and Edenfield worked as buyers, each of the men received increases of $2500 but Miranda,

---

**15.** As we noted above, Title VII incorporates a more relaxed standard of similarity between male and female-occupied jobs, thus plaintiff is not required to meet the exacting standard of substantial equality of positions set forth in the Equal Pay Act. *See Beall v. Curtis, supra.*

the sole female buyer, received only a $160 increase. B & B contends that its policy of treating the move to buyer as a lateral transfer and its decision to pay Miranda less because of her lack of experience as a store manager constitute a "factor other than sex."

The trial court, however, took note of Bever's statement that "any third man would be astounded to have the title I'm giving you." This comment indicates that the company president did not view plaintiff in the same light as the other buyers, but only as comparable to a lower-level employee at the store level, at least in part because she had worked primarily in female-dominated positions.

In *Corning Glass*, the Supreme Court held that the fact that women will work for less than men is a "market force defense" and not a legitimate "factor other than sex." This court dealt with other such "market forces" defenses in *Glenn v. General Motors Corp.*, 841 F.2d 1567 (11th Cir.), *cert. denied*, 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988). In *Glenn,* the defendant had a policy against requiring an employee to take a cut in pay when transferring from hourly wage jobs into salaried positions. Because the men made more money at their positions than the women did, the men were paid more for doing the same job. This court rejected General Motors' argument that prior salary alone was a factor other than sex and affirmed the district court's ruling that the company had violated the Equal Pay Act.

The logic of *Glenn* is equally applicable here. Men are hired as "stock boys" and "bag boys," and can become fourth "man," third "man," assistant manager and, eventually, store manager. Buyers are generally required to have been store managers, and store managers have always come from the bagboy line of promotion. Women essentially have been excluded from the line of promotion that leads to management positions. Miranda was the only woman to have earned the title of "buyer" and when she reached that level, she was limited to the salary she had made as a clerical worker. B & B has demonstrated only its reliance on an illegitimate market force theory to justify its failure to pay Miranda the same salary as the male employees in her classification.

We are aware that other circuits view the relationship between Title VII and the Equal Pay Act differently. *See, e.g., Plemer v. Parsons–Gilbane,* 713 F.2d 1127, 1133 (5th Cir.1983); *E.E.O.C. v. Sears, Roebuck & Co.,* 839 F.2d 302, 343 (7th Cir.1988) (Without direct evidence of intentional sex-based wage discrimination, plaintiff "must meet the equal pay standard of the EPA to prove ... Title VII sex discrimination in wages claim"); *McKee v. Bi-State Development Agency,* 801 F.2d 1014, 1019 (8th Cir.1986) (The Eighth Circuit simply stated that "[w]here a claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of Title VII."); *Foster v. Arcata Associates, Inc.,* 772 F.2d 1453, 1465 (9th Cir.1985) ("[W]hen a Title VII claimant contends that she has been denied equal pay for substantially equal work, ... Equal Pay Act standards apply."). By applying Equal Pay Act standards whether the suit alleges an Equal Pay Act or a Title VII violation, these cases view *Gunther* and the anti-discrimination laws in an artificially constricted manner. As such, we decline to follow them.

For example, under *Plemer* when a plaintiff alleges "equal pay for equal work" based on sex, the Fifth Circuit would require evidence of a transparently sex-based wage discrimination system or *direct evidence* (other than that which the plaintiff offers in support of the EPA claim) of sex-based wage discrimination. 713 F.2d at 1133. Citing *Gunther*'s continual references to the uniqueness of the plaintiffs' claim and the strength of the evidence being offered (*i.e.* direct evidence) in *Gunther, Plemer* determined that the Supreme Court "was concerned with *blatant* cases of sex discrimination in which the only stumbling block to underpaid females' causes of action was the fact that the victimized women did not hold jobs similar to those held by men." 713 F.2d at 1133 (emphasis added). We disagree.

We believe that the "direct evidence" standard, such as the one adopted by the Fifth Circuit, eviscerates the standards and burdens for a Title VII case as set out in *Burdine* and *McDonnell Douglas*. The argument that the Equal Pay Act and its standards and burdens are the *only* way to litigate an "equal pay for equal work" claim might be more persuasive if the Equal Pay Act had been passed after Title VII, as an effort to narrow the Civil Rights Act as it applies to gender-based discrimination. In fact, however, that was not the case. Incorporating the "direct evidence" standard would only help clever, but venal, employers who discriminate against women and are not compliant enough to admit it directly. Most importantly, it would shield employers who significantly underpay women but seek to avoid the requirements of the Equal Pay Act by changing the job description in a slight way that does not affect the substance of the responsibilities.

In sum, we agree with the trial court that Bever's statement "reveals an attitude on the part of the company president that plaintiff had no right to expect to be paid a buyer's wages for work which was at least similar to that performed by the other full buyers, all of whom were male." We therefore affirm the trial court's determination that B & B illegally discriminated against the plaintiff on the basis of her sex.

III. *Statute of Limitations and Equitable Tolling*

Title VII requires a person seeking relief from employment discrimination to file a charge with the Equal Employment Opportunity Commission (EEOC) within one hundred and eighty days after the alleged unlawful employment practice has occurred. 42 U.S.C. § 2000e–5(e). Miranda contends that B & B discriminated against her in the payment of her salary from the time she was hired as a buyer in July, 1986 at the rate of $400 per week (when the other buyers received approximately $600 to $650

per week), until the time she left B & B's employ in July, 1988. Miranda was aware of the salary disparity at the time she was promoted, but she did not file a charge with the EEOC until August 11, 1988. Plaintiff explains that she did not file the charge until after her position was terminated on July 25, 1988, because she feared losing promised benefits and because she was assured on several occasions that the pay inequity would be cured. She argues, therefore, that for the purposes of her wage discrimination claim, the statutory time limit for filing a charge with the EEOC was equitably tolled from the time she took the position as a buyer in July, 1986, until she was notified on July 25, 1988, that her position was to be eliminated.[16] The trial court agreed, and ruled that the EEOC charge and Miranda's lawsuit were not time-barred. We agree with the trial court.

■ The requirement of timely filing a charge with the EEOC is not jurisdictional; rather, it is a statutory limitation that is subject to equitable tolling. *See Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924 (5th Cir.1975).[17] Precedent in this circuit and in the former Fifth Circuit has established that the limitations period is tolled "until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for [her] rights." *Cocke v. Merrill Lynch & Co.*, 817 F.2d 1559 (11th Cir.1987).

■ The question of whether or not equitable tolling applies is a legal one and thus is subject to *de novo* review, but we are bound by the trial court's factual findings unless they are clearly erroneous. *Cabriolet Porsche Audi v. American Honda Motor Co.*, 773 F.2d 1193, 1201 (11th Cir.), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1985).

---

**16.** It is undisputed that plaintiff filed suit within the ninety day time period after receiving a right-to-sue letter from the EEOC. *See* 42 U.S.C. § 2000e–5(f).

**17.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

In this case, as in *Reeb*, tolling is appropriate because the trial court found that the plaintiff was led by the defendant to believe that the unfair treatment would be rectified. As the Supreme Court stated in *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 233, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959), "[t]he principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage." (citation omitted).

Here, the trial court made findings of facts that support the determination that the limitation period was equitably tolled:

> [D]uring her tenure as buyer, [Miranda] ... made several requests for her salary to be raised to the level that the other buyers were receiving. She was given repeated assurances by Tidwell and Phillips that something would be worked out. It does not appear that she was ever told that the pay disparity would go uncorrected. In May 1988, plaintiff received a formal written evaluation and extra items to purchase which she had hoped would trigger a pay increase. It was not then corrected but Plaintiff continued to seek an increase through her superiors. Although she had suspicions of sex discrimination when she accepted the buyer's job at the pay range offered, it was not until July, 1988 when she was notified of the elimination of her job, that plaintiff had all the facts indicating that her wage-related complaints would not be corrected as promised.

Order at 17–18 (citations omitted).

The trial court therefore was correct in its holding that the limitations period was tolled until July, 1988, and that Miranda's claim was not time-barred. *See Washington v. Ball*, 890 F.2d 413, 414 (11th Cir. 1989) (setting out three of the instances in which equity requires tolling of statute of limitations: when an action is pending before a state court; when a defendant has concealed fact supporting a cause of action under Title VII; and when a defendant has misled the plaintiff about the nature of her rights under Title VII).

## IV. *The Equal Pay Act Claim*

As noted above, the trial court granted the defendant's motion for partial summary judgment on Miranda's claim arising under the Equal Pay Act. When examining summary judgments, our review is plenary and we apply the same legal standards that controlled the district court. *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985). To survive a motion for summary judgment, a plaintiff must at least establish the necessary elements of his or her cause of action and demonstrate the presence of genuine issues of material fact. *Lowe v. Aldridge*, 958 F.2d 1565 (11th Cir. 1992). We will affirm a grant of summary judgment only if no genuine issues of material fact exist and only if the moving party is entitled to judgment as a matter of law. *American & Foreign Ins. v. Colonial Mtg. Co.*, 936 F.2d 1162, 1164 (11th Cir.1991). We review the facts in the light most favorable to the non-movant, Miranda, and resolve all factual disputes in her favor. We are bound, however, to review only the facts presented to the district court in the Response to Defendant's Motion for Partial Summary Judgment. In other words, only facts presented during the resolution of the motion for summary judgment, and not facts presented at the later bench trial on the Title VII claim, are relevant to our review of the grant of summary judgment on the Equal Pay Act claim.

To establish a *prima facie* case under the Equal Pay Act of 1963, a complainant "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)). Once a plaintiff makes out a *prima facie* case, the burden shifts to the

employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. at 2229 (quoting 29 U.S.C. § 206(d)(1)). The jobs held by the employees of opposite sexes need not be identical; rather, they need only be substantially equal. *Corning Glass Works,* 417 U.S. at 203–04, 94 S.Ct. at 2232–33.

■ The Equal Pay Act prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a "factor other than sex" is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant. *See Mitchell v. Jefferson County Bd. of Educ.,* 936 F.2d 539 (11th Cir.1991).

■ A plaintiff establishes a *prima facie* case by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs. *Brock v. Georgia Southwestern College,* 765 F.2d 1026, 1032 (11th Cir.1985). Because at this stage the jobs and not the employees are compared, only the skills and qualifications actually needed to perform the jobs are considered. Therefore, Kelley's experience as a manager before he became a buyer is not relevant to whether or not his job and Miranda's are substantially similar.[18]

■ The prima facie case also focuses solely on the primary duties of each job, not duties that are incidental or insubstantial. Any extra duties that might be used to distinguish two jobs may not be tasks that are typically performed by other personnel at lower pay. *See Jones v. Westside–Urban Health Center,* 760 F.Supp.

1575 (S.D.Ga.1991) (citing *Goodrich v. International Brotherhood of Electrical Workers,* 815 F.2d 1519, 1524 (D.C.Cir. 1987)).

The plaintiff need not prove that the job held by her male comparator is identical to hers; she must demonstrate only that the skill, effort and responsibility required in the performance of the jobs are "substantially equal." 29 U.S.C. § 206(d)(1); *Corning Glass Works,* 417 U.S. at 204, 94 S.Ct. at 2232–33; *Brock v. Georgia Southwestern College,* 765 F.2d 1026, 1032 (11th Cir. 1985). Although job titles are entitled to some weight in this evaluation, "the controlling factor under the Equal Pay Act is job content"—the actual duties that the respective employees are called upon to perform. *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049 (5th Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973).

■ Whether the buyer jobs held by Miranda and Kelley were substantially similar is a crucial issue in this case. The trial court determined that the plaintiff had not presented sufficient evidence to establish a *prima facie* case of substantial similarity. If, however, the evidence presented by Miranda, taken as true, would establish an Equal Pay Act violation and there was sufficient evidence such that a jury could find in Miranda's favor, then summary judgment is improper and a trial on the merits is necessary to resolve the factual disputes.

■ The party responding to summary judgment may not rest on her pleadings to demonstrate the presence of an issue of fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970); *Junkins v. U.S. Industries,* 736 F.2d 656 (11th Cir.1984). Federal Rule of Civil Procedure 56 requires that a party defending against a motion for summary judgment respond with affidavits, depositions, or other evidence to demonstrate that there are material facts that must be presented to a jury for resolution. *See Adickes,* 398 U.S. at 161, 90 S.Ct. at

---

18. Factors such as experience and education operate as a defense to liability rather than as part of a plaintiff's *prima facie* case under the

Act. *See, e.g., Covington v. Southern Illinois University,* 816 F.2d 317 (7th Cir.1987).

1610. Although both parties agree that Miranda and Kelley handled a different number of items to purchase, they disagree as to the significance of this fact, that is, whether the overall responsibility of her job was substantially the same as that of Kelley. Miranda argues that the number of products ordered is not determinative of the responsibility of the job. She points out that Harold Tidwell, the head buyer, considered her to be a "full-fledged" buyer, one with as many responsibilities as the other buyers and whose salary should have been adjusted upward. If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Mercantile Bank & Trust v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985).

We also note that careful review of the affidavits attached to the Response to the Motion for Summary Judgment demonstrate that early in 1988 Miranda was given additional products to purchase, and was henceforth responsible for the same number of products as was Kelley. This fact was not specifically mentioned in the plaintiff's responsive pleading, however, and it is unclear whether the trial court considered it in weighing the motion for summary judgment.[19]

After careful review of the facts presented to the trial court on the Partial Motion for Summary Judgment, we find that there exists a genuine issue of material fact as to the similarity of the jobs held by Karen Miranda and Don Kelley and that a reasonable jury could find that B & B violated the Equal Pay Act by failing to pay them equal wages. We therefore reverse the grant of summary judgment to B & B on this issue.

## V. *Damages*

 B & B's contentions regarding the calculation of damages do not merit extended discussion. Title VII requires that a plaintiff be made whole for discrimination suffered at the hand of the defen-

dant. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). As the Supreme Court stated in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976), Title VII "vest[s] broad equitable discretion in the federal courts to 'order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate.'" The trial court did not abuse its discretion by awarding Miranda the difference between her salary and the average salary paid to the other male buyers, both in terms of weekly pay and year-end salary adjustment. *See EEOC v. Guardian Pools Inc.,* 828 F.2d 1507 (11th Cir.1987) (applying abuse of discretion standard for review of backpay awards); *Nord v. U.S. Steel Corp.,* 758 F.2d 1462 (11th Cir.1985) (same); *Jepsen v. Florida Bd. of Regents,* 754 F.2d 924 (11th Cir.1985) (same).

### Conclusion

For the foregoing reasons, we AFFIRM the trial court's finding of intentional gender-based wage discrimination under Title VII of the Civil Rights Act of 1964 and AFFIRM the award of $52,765.83 in backpay. We REVERSE the grant of Partial Summary Judgment on the Plaintiff's claim under the Equal Pay Act and REMAND the case to the district court for a trial.

AFFIRMED in part, REVERSED in part, and REMANDED.

DUBINA, Circuit Judge, concurring specially:

I concur with the majority's opinion. However, I write separately to note the uncertainty pervading the law as to Miranda's Title VII claim.

This case presents squarely for the first time in this circuit the issue of Title VII's relationship to the Equal Pay Act ("EPA").

19. We note this fact to illustrate that the record, taken as a whole, is far from clear that Miranda could not establish a *prima facie* case for a violation of the Equal Pay Act, either from the beginning of her tenure as a buyer or from the date at which the number of products for which she was responsible was equal to Kelley's.

As I understand the majority's holding, Miranda succeeds upon a theory of intentional sex-based wage discrimination under Title VII, regardless of whether she succeeds under her claim under the EPA. In so holding, the majority's opinion confronts an issue about which there is much conflict. That is, what standards are to be applied to intentional sex-based wage discrimination claims brought under Title VII? The majority holds that traditional *McDonnell Douglas/Burdine* standards apply. I agree.

Courts differ as to the kind of evidence sufficient to support *Gunther*-based Title VII claims.[1] For instance, the Fifth and Seventh Circuits view these claims narrowly. In *E.E.O.C. v. Sears Roebuck & Co.*, 839 F.2d 302 (7th Cir.1988), the Seventh Circuit stressed the "limited scope" of *Gunther. Id.* at 340. Under the Seventh Circuit's approach, only evidence of discrimination that is "clear and straightforward" would be sufficient to make out a Title VII wage discrimination claim not based on equal work. *Sears*, 839 F.2d at 342. Moreover, *Sears* adopted the dissent's argument in *Gunther* that

> [a]ll that [*Gunther*] seems to mean ... is "that even absent a showing of equal work, there is a cause of action under Title VII when there is direct evidence that an employer has *intentionally* depressed a woman's salary because she is a woman. The decision today does not

approve a cause of action based on a *comparison* of the wage rates of dissimilar jobs.

*Sears*, 839 F.2d at 341 (quoting *Gunther*, 452 U.S. at 204, 101 S.Ct. at 2265 (Rehnquist, J., dissenting) (emphasis in original)).

In *Plemer v. Parsons–Gilbane*, 713 F.2d 1127 (5th Cir.1983), the Fifth Circuit emphasized *Gunther*'s unique facts to determine that the plaintiff before it failed to make out a Title VII wage discrimination case not based on equal pay. *Plemer* cites *Gunther*'s continual references to the uniqueness of the plaintiff's claim and the strength of the evidence being offered, i.e. direct evidence. The Supreme Court, according to *Plemer*, "was concerned with *blatant* cases of sex discrimination in which the only stumbling block to underpaid females' causes of action was the fact that the victimized women did not hold jobs similar to those held by men." *Id.* at 1133 (emphasis supplied).

The *Plemer* court found that to succeed under a *Gunther*-based suit, the plaintiff must (1) show a "transparently sex-biased system for wage determination, or (2) offer "direct evidence" (other than that offered to prove an "equal pay for equal work" claim) that the employer paid her less than it would have had she been a male. *Id.* at 1133. Determining that the plaintiff's case lacked such evidence and therefore fell beyond the scope of a *Gunther*-based claim,

---

1. *Gunther*-based causes of action under Title VII are those brought upon a theory of intentional sex-based wage discrimination. Another cause of action lies under Title VII based upon a theory of equal work for unequal pay. The standards to be applied to a Title VII claim brought under an equal work theory are vigorously disputed. *See Fallon v. Illinois*, 882 F.2d 1206 (7th Cir.1989) (sex-based salary discrimination claims under Title VII and EPA are not coextensive because of differing burdens of proof); *Peters v. Shreveport*, 818 F.2d 1148, 1160–61 (5th Cir.1987) (Bennett Amendment does not incorporate structure of sex discrimination claims under the EPA into Title VII); *see also Brewster v. Barnes*, 788 F.2d 985, 992–93 n. 13 (4th Cir.1986) (liability under EPA not tantamount to finding of intentional discrimination under Title VII); *Churchill v. International Business Machines, Inc., Nat. Service Div.*, 759 F.Supp. 1089, 1096–97 (D.N.J.1991) (Title VII claim for sex-based wage discrimination to be

decided according to traditional Title VII burdens); *but see Korte v. Diemer*, 909 F.2d 954, 957–58 (6th Cir.1990) (analysis of unequal pay for equal work claim essentially the same under both Equal Pay Act and Title VII); *McKee v. Bi–State Development Agency*, 801 F.2d 1014, 1019 (8th Cir.1986) (where claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges violation of Equal Pay Act or Title VII); *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1465 (9th Cir.1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986) (when Title VII claimant contends that she has been denied equal pay for substantially equal work Equal Pay Act standards apply).

Because the district court dismissed on summary judgment Miranda's EPA claim, the issue of the relative standards to be applied in a Title VII case brought under an equal work theory need not be addressed.

the court then determined whether the plaintiff succeeded under her "classic equal pay act" claim theory.

Thus, according to the Fifth and Seventh Circuits, *Gunther* allows plaintiffs who cannot prove "equal work" under the EPA to proceed under Title VII, but only upon direct evidence of intentional wage discrimination based on sex. Absent such a showing, the Fifth and Seventh Circuits will not entertain suits based on a comparison of wages paid for dissimilar jobs.

The Ninth Circuit, on the other hand, accepts traditional *McDonnell Douglas/Burdine* proof of discriminatory intent. In *Spaulding v. University of Washington,* 740 F.2d 686 (9th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984), *overruled on other grounds, Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477 (9th Cir.1987) (en banc), the Ninth Circuit declined to specify the minimum factors required for plaintiffs to establish a prima facie Title VII case of sex-based wage discrimination. However, noting *McDonnell Douglas'* flexibility, the court stated that a plaintiff's case rests "solely on evidence creating an inference that the wage disparity ... was more likely than not the result of intentional sex discrimination." *Spaulding,* 740 F.2d at 700. Other courts have likewise adopted this standard. *See International Union, etc. v. Michigan,* 886 F.2d 766, 769 (6th Cir.1989) (in case of mere rough job comparability, intentional discrimination must be shown); *Foster,* 772 F.2d at 1465 n. 5 (Title VII wage discrimination claim not based on equal work theory must be analyzed separately under Title VII standards); *American Federation of State, County & Municipal Employees, AFL–CIO v. County of Nassau,* 799 F.Supp. 1370 (E.D.N.Y. 1992) (applying traditional Title VII intentional discrimination standards to Title VII intentional wage discrimination claim based on sex); *but see Gallagher v. Kleinwort Benson Government Secur., Inc.,* 698 F.Supp. 1401, 1405 (E.D.Ill.1988) (circumstantial evidence insufficient to meet *Gunther* standard).

I am troubled by the strict interpretation of *Gunther* advanced by the Fifth and Seventh Circuits. Moreover, I agree with the majority that the "direct evidence" standard suggested by the Supreme Court and adopted by the Fifth and Seventh Circuits eviscerates the standards and burdens for a Title VII case as set out by the Court in *Burdine* and *McDonnell Douglas.* Disparate treatment cases do not ordinarily require direct evidence; indeed, it almost never exists.

Moreover, I am disturbed by a standard that requires direct evidence of sex-based wage discrimination in one case, but permits circumstantial evidence in an identical case brought upon a theory of race discrimination. Indeed, as I understand it, a black woman claiming wage discrimination based on *color* would need to proffer circumstantial evidence only; however, the same wage discrimination claim based this time on *sex* would then require direct evidence. This is not logical. It seems to me that plaintiffs who bring *Gunther*-based claims should be held to the same standards as any other Title VII disparate treatment plaintiff. *See Forsberg v. Pacific Northwest Bell Tel. Co.,* 840 F.2d 1409, 1418 (9th Cir.1988) (although direct proof of discrimination is difficult to obtain, requisite discriminatory intent may be inferred from circumstantial evidence) (citing *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

This is a complex area of law, suffused with legislative and judicial uncertainty. Nonetheless, the majority's approach is correct. Miranda was discriminated against. Should she on remand fail to meet the equal work requirement of the EPA, the direct evidence standard advanced by the Fifth and Seventh Circuits would most likely strip her of legal recourse. *Gunther* teaches that Title VII is broader than the EPA. The majority's decision properly delineates the contours of its breadth.