**AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY,**
Plaintiff,

v.

**Becky M. BLOCKER, Cuyler Edward Blocker, Thomas L. Johnson, Judith A. Johnson, and M. Pete McNabb of Alabama, Inc., Defendants.**

No. Civ. 99–0691–CB–L.

United States District Court,
S.D. Alabama,
Southern Division.

March 27, 2001.

---

MONY's alternative theories of removal jurisdiction.

Edward B. McDonough, Jr., Mobile, AL, Keith S. Miller, Brantley & Wilkerson, P.C., Montgomery, AL, for plaintiff.

Becky M. Blocker, Tulsa, OK, Daphne, AL, pro se.

Cuyler Edward Blocker, Owasso, OK, pro se.

George R. Irvine, III, Stone Granade & Crosby, P.C., for Becky M. Blocker and Cuyler Edward Blocker.

David P. Shepherd, Mark S. Gober, Fairhope, AL, for Thomas L. Johnson and Judith A. Johnson.

## ORDER

BUTLER, Chief Judge.

This matter is before the Court on Plaintiff American National Property and Casualty Company's ("ANPAC") Motion for Summary Judgment, filed June 29, 2000 (Doc. 33). In this declaratory judgment action, ANPAC seeks a declaration from this Court that ANPAC has no duty to indemnify or defend Mrs. Becky M. Blocker (Mrs. Blocker) and/or Mr. Cuyler Edward Blocker (Mr. Blocker) for numerous state claims that have been brought against them, both collectively and individually, by the parties listed below. Of the parties in this action, only co-Defendants Thomas L. Johnson and Judith A. Johnson ("The Johnsons") have filed a response to Plaintiff's Motion (Docs.40, 50). The claims, all of which have been brought in the Circuit Court of Baldwin County, Alabama, arise out of a series of real estate transactions between the Blockers, the Johnsons and M. Pete McNabb of Alabama, Inc. Though multiple state claims, counter-claims, third-party claims, amended Federal complaints and Motions for summary judgment have been filed and supplemented in this matter, resolution of the procedural intricacies of this case at this juncture would not directly impact the Court's determination of the parties' respective liabilities. Therefore, in the interests of clarity and brevity, the Court confines any detailed explanation of the procedural elements in this action to its concurrently issued Order of March 27, 2001 (granting, *inter alia*, ANPAC's Motion for Leave to file its Third Amended Complaint for Declaratory Judgment). After considering ANPAC's Motion for Summary Judgment, supporting briefs, evidence on file and applicable law, the Court finds for the reasons set forth below that Plaintiff's Motion for Summary Judgment is due to be **GRANTED**.

## I. Facts

The Court hereby adopts the parties' "Agreed Facts" from the Joint Pre–Trial Order. Only counsel for ANPAC and the Johnsons have signed the Joint Pre–Trial Order; however, the other co-Defendants have been given full notice of the proceedings, and apparently have chosen not to participate. As the Court is not aware of any objection by any party as to the characterization or substance of the "Agreed Facts" as memorialized in the Joint Pre–Trial Order, the Court finds as follows.

In the Spring of 1996, Mr. Blocker purchased an interest in First American Builders, Inc. ("FAB") a construction company. Prior to purchasing his interest in FAB, Mr. Blocker had contracted with FAB for the construction of his own personal home and two homes which Mr. Blocker had built for the sole purpose of reselling for a profit. These two "speculative homes" were financed in Mr. Blocker's name only. Mrs. Blocker did not participate in the financing and/or construction of the two houses. Shortly after becoming a shareholder in FAB, Mr. Blocker began assisting in the day to day operations of the company. Conversely, Mrs. Blocker had no ownership interest in FAB and has never been an officer, director, principal or employee of said entity. She has never had any personal knowledge of the day to day operations of FAB.

In approximately August, 1996, FAB decided to change its name to Legendary Home Builders, Inc. ("Legendary"), due to

FAB's poor reputation as a result of its failure to timely complete several projects and/or to perform warranty work. Mr. Blocker became the acting president and a member of the Board of Directors of Legendary. Mrs. Blocker had no ownership interest in Legendary and has never been an officer, director, principal or employee of said entity. She has never had any personal knowledge of the day to day operations of Legendary.

In early 1996, Mr. Gene Austin approached FAB concerning the possibility of purchasing the plans and specifications for one of its Arthur Rutenburg Homes. FAB refused to sell Mr. Austin its plans or specifications. As a result, Mr. Austin agreed to enter into a contract with FAB for the construction of his home. During the construction of the home, it was noted that the pitch of one of the roof trusses/girders was not correct. While attempting to correct this problem, numerous other problems relating to structural integrity were discovered. The Austins were dissatisfied with these and other aspects of the construction. In approximately August, 1996, Mr. Blocker contacted Mr. Austin concerning an overdue draw. At that time, Mr. Austin expressed concerns about whether FAB could complete the house and about the quality of the workmanship in general. Eventually, the Austins retained an attorney and demanded that FAB buy back the home under construction in order to settle any and all claims they might have against FAB arising from the construction of the home.

In September, 1996, in response to the Austins' settlement demand, Mr. Blocker had an appraisal done on the home which showed a value of approximately $400,000.00. FAB wanted to purchase the home from Mr. Austin to resolve the matter. However, at that time, Mr. Blocker had already loaned the company over $700,000.00 and the company did not have any credit which it could use to borrow the funds to purchase the home. As a result, Mr. Blocker approached his wife about the possibility of purchasing the home as an investment property or as a "speculative house." Mr. Blocker told his wife in general terms about the problems with the house and with the Austins. He did not discuss with her the structural problems concerning the girders and trusses. He told Mrs. Blocker that, based upon the appraisal, he felt that she could realize a profit from sale of the home. With this understanding, Mrs. Blocker agreed to purchase the home from the Austins.

On October 31, 1996, the Austins transferred the subject property to Mrs. Blocker. She bought the house with the expectation of selling it for a profit. In consideration of Mrs. Blocker buying the house, the Austins released all claims they had against FAB, its officers, directors, employees, etc. Mr. Blocker has acknowledged that Mrs. Blocker's purchase of the property did benefit FAB and helped the company avoid litigation. Mrs. Blocker used funds loaned to her by Southtrust Bank to purchase the property. The standard form promissory note executed by Mrs. Blocker states that the borrower (Mrs. Blocker) "represent[s] and agree[s] that the proceeds of the loan evidenced by this note shall be used solely for business purposes and shall not be used for any personal, family, household, consumer or other purpose." The Blockers have testified that they understood that the loan was a personal loan to Mrs. Blocker. Mrs. Blocker was the only obligor on the loan. Mr. Blocker made the interest payments on Mrs. Blocker's loan from Southtrust using funds from the Blocker's joint checking account. Mr. Blocker has acknowledged that the proceeds from the sale of his other two investment properties were also placed into one of their joint checking accounts.

Once the property was transferred to Mrs. Blocker, sales personnel from the McNabb Company began trying to sell the home on behalf of Mrs. Blocker. Mrs. Blocker also listed the home for sale with Meyer Real Estate, Inc. FAB continued to experience financial difficulties and by January, 1997, the company owed Mr. Blocker approximately $900,000 for loans he had made to it. At that time, Mr. M. Pete McNabb and Mr. Blocker began discussing the possibility of forming a new construction company. FAB subsequently transferred all of its hard assets to Mr. Blocker in partial satisfaction of its obligations to him. Mr. Blocker then in turn contributed those assets to the McNabb Company. Mr. McNabb contributed operating capital to the new company. Mr. Blocker became the secretary-treasurer of the McNabb Company. Mrs. Blocker has never been an officer, director, principal or employee of said entity. Mrs. Blocker has never had any personal knowledge regarding the day to day operations of the McNabb Company. The McNabb Company entered into a franchise agreement with Arthur Rutenberg Homes wherein it agreed to assume responsibility for any warranty work which FAB and/or Legendary Home Builders, Inc. was required to provide. The McNabb Company also assumed responsibility for completing the house which Mrs. Blocker had purchased from the Austins.

In approximately November, 1997, Ms. Meg Vogt, an employee of the McNabb Company, contacted Mr. Blocker with an offer from Mr. and Mrs. Thomas L. Johnson to purchase the subject premises. The offer included a requirement that Mrs. Blocker purchase an undeveloped lot from the Johnsons that was located in the same subdivision. Mr. and Mrs. Blocker discussed the offer and decided it would be easier to sell the undeveloped lot. Mrs. Blocker and the Johnsons eventually entered into an agreement wherein the John-sons agreed to purchase the subject premises. Mr. Blocker was not a party to the agreement between Mrs. Blocker and the Johnsons. Mr. Blocker dealt with Ms. Vogt during the negotiations with the Johnsons and with FAB and the McNabb Company with respect to the completion of the construction of the subject premises. Mr. Blocker has testified that, as far as he knows, he acted with Mrs. Blocker's permission.

Mrs. Blocker's recollection of the underlying events is extremely limited. However, she does not dispute her husband's account of the underlying events. On January 21, 1998, Mrs. Blocker transferred the subject premises to the Johnsons. Pursuant to the terms of the purchase agreement, Mrs. Blocker purchased an undeveloped lot from the Johnsons on the same date. On May 27, 1998, Mrs. Johnson wrote to Mr. Blocker at Arthur Rutenburg Homes seeking assurance that a list of "defects/punch list items" would be repaired. On June 9, 1998, Mr. Johnson wrote to Mr. Blocker at Arthur Rutenburg Homes concerning certain warranty items which still had not been completed and/or repaired adequately. In this correspondence, Mr. Johnson stated . . . it is "clear that litigation probably is going to be the answer." He also stated that . . . "Let us solve the problem the easy way." He also states that they bought "Rutenburg quality, service and guarantee." Mr. Blocker referred these complaints to the McNabb Company.

On June 13, 1998, Mr. Johnson again wrote to Mr. Blocker at Arthur Rutenburg Homes listing a number of "defects" and demanding that he be provided with a schedule for completing these repairs. Mr. Johnson stated . . . "I do not like litigation . . . It is stressful and time consuming." Again, Mr. Johnson stated . . . "Let us solve the problem the easy way."

However, Mr. Johnson again concluded his letter by stating that "it is clear that litigation is probably going to be the answer." Mr. Blocker did not contact ANPAC after receiving this letter. Mr. Blocker has testified that he was focused on getting the problem resolved. He testified that he construed the letters as a cordial attempt to get the problem taken care of and did not construe these letters as threats of litigation. However, he was aware that Mr. Johnson was unhappy.

On December 31, 1998, Mr. and Mrs. Johnson brought suit against Mrs. Blocker, the McNabb Company, FAB and Ms. Meg Vogt in the Circuit Court of Baldwin County, Alabama ("the state court action"). The "defects" listed in Mr. Johnson's June 13, 1998, letter are included in the "defects" listed in the Johnsons' amended complaint in the state court action. Mr. Blocker has acknowledged receiving each of the aforementioned letters. Mr. Blocker has also acknowledged that at this time the McNabb Company was having difficulty performing warranty work in a timely fashion and that the Johnsons were looking to Mr. Blocker, the McNabb Company and Arthur Rutenburg Homes to ensure that the repairs were made. Mr. Blocker did not inform ANPAC of the Johnsons' complaints at the time he received the aforesaid letters. Viewing these letters as cordial attempts by the Johnsons to have their problems addressed, Mr. Blocker stated that he was attempting to get the McNabb Company to address the Johnsons' complaints. Mr. Blocker turned the letters over to those employees of the McNabb Company whom he believed responsible for addressing the Johnsons concerns. In August 1998, Mr. Blocker ended his association with the McNabb Company due to its continued financial problems.

On January 11, 1999, Mrs. Blocker was served with the Johnsons' complaint in the state court action. Mr. Blocker then contacted George Irvine, Esquire, who advised him to contact ANPAC. Mr. Blocker initially contacted Mr. Jim Fentress, the Blockers' ANPAC agent. On January 29, 1999, Mr. Irvine forwarded a demand to ANPAC on behalf of Mrs. Blocker. Mr. Blocker's telephone call and Mr. Irvine's letter were ANPAC's first notice of the Johnsons' claims and/or their lawsuit. The Johnsons have alleged that Mrs. Blocker has breached the express and implied warranties that accompanied their new home and the terms of their contract with her by selling them a home which is structurally unsound and otherwise defective. The Johnsons also allege that Mrs. Blocker "willfully, recklessly or innocently" misrepresented to them a number of facts concerning their home including, but not limited to, that the home they purchased was "a new home, free from defects and constructed in accordance with applicable laws and regulations." The Johnsons also allege that Mrs. Blocker intentionally suppressed and concealed material facts about the condition of the home and that as a result they were defrauded. Finally, the Johnsons allege that Mrs. Blocker's "intentional fraudulent suppression and/or concealment" of the alleged pre-existing structural damage to their home amounts to extreme and outrageous conduct.

On November 17, 1999, the McNabb Company filed a third-party complaint against Mr. Blocker in the state court action. The McNabb Company has alleged the following in its third-party complaint: (1) that at the time the McNabb Company was formed Mr. Blocker represented to Mr. McNabb and the corporation that the subject premises would not be included in the corporation's "inventory"; (2) that despite these representations Mr. Blocker used one of the McNabb Company's form contracts for the sale of the subject premises to the Johnsons; (3) that as a result of Mr. Blocker's actions the

Johnsons received a "Service Guarantee" from the corporation for which the corporation received no consideration; and (4) that Mr. Blocker concealed from the corporation his actions with respect to the securing of the "Service Guarantee" for the Johnsons. The McNabb Company asserts that Mr. Blocker's conduct constitutes fraud, suppression of material facts and a breach of his fiduciary duty to the corporation arising out of his status as an officer and shareholder of the corporation. At all material times, Mr. Blocker was an officer, director and shareholder of the McNabb Company.

The allegations against Mr. Blocker implicate him in this matter as an officer and shareholder of the companies involved. These companies were in the business of constructing and selling homes for a profit. The Second Amended Complaint actually alleges that Mr. and Mrs. Blocker were "merchants" with respect to the sale of this house. Mrs. Blocker was never an officer, director or shareholder of any of the corporations involved in the underlying litigation. The McNabb Company has also filed a cross-claim against both Mr. and Mrs. Blocker basically reiterating the allegations of its third-party complaint against Mr. Blocker but with equal force against Mrs. Blocker. The McNabb Company also alleged that at all material times Mrs. Blocker was the wife of Mr. Blocker and that she acted under his direction and control in these matters.

During the relevant time frame, Mr. and Mrs. Blocker had in force with ANPAC two homeowners policies, those being Policy No.01–H–E03–058–2 and Policy No. 01–H–H50–828–0, as well as a Personal Umbrella Policy, that being Policy No. 01–U–860–787. Each of the subject policies includes a definition of "bodily injury" and "property damage" and limits the coverage of the policies to damages that fall within these definitions. Each of the subject policies includes a punitive damages exclusion. The Homeowner's Policies cover only liabilities growing out of an "occurrence," the definition of which requires that there be "an accident." The Umbrella Policy states that its coverage is no broader than that of the underlying policies. ANPAC has undertaken Mr. and Mrs. Blockers' defense in the state court action with a full reservation of its rights and has brought this declaratory judgment action seeking a determination of its rights and obligations with respect to its insureds.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *accord Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir.1992).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson,* 106 S.Ct. 2505, 477 U.S. at 251–252. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding

whether the movant has met this burden the Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985)).

Once the movant satisfies their initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, as the movant has done in this case, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton,* 965 F.2d at 998 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). " 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' " *Tipton,* 965 F.2d at 999 (quoting *Anderson,* 106 S.Ct. 2505, 477 U.S. at 255). "Where

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita,* 106 S.Ct. 1348, 475 U.S. at 587 (internal quotation and citation omitted).

## III. Coverage Exclusions in Alabama

Where the terms of the policy are clear, courts may not rewrite the terms of a policy or interpret unambiguous policy language to provide coverage that was not intended by the parties. *See Canal Ins. Co. v. Old Republic Ins. Co.,* 718 So.2d 8, 12 (Ala.1998). Generally, an insurer's obligations with respect to providing a defense to its insured in an action brought by a third-party are determined by the allegations contained in the third-party's complaint. *Ladner and Co., Inc. v. Southern Guaranty Ins. Co.,* 347 So.2d 100, 102 (Ala.1977).

The Alabama Supreme Court has used a two prong analysis in determining whether a given business pursuits exclusion is applicable: "First did the injury arise out of a business pursuit? . . . Second, did the injury arise out of an activity which is ordinarily incident to a non-business pursuit?" *Id.* Courts have also held in such circumstances that any alleged tortious conduct may also not be subject to coverage, if the conduct complained of is demonstrably related to business pursuits, and any breach of that duty is not an activity ordinarily incidental to a non business pursuit. *See State Farm Fire & Casualty Co. v. Hiermer,* 720 F.Supp. 1310, 1315 (S.D.Ohio 1988) (finding alleged tortious conduct arose out of "a whole course of conduct which was part of the business relationship").

The Alabama Supreme Court has previously defined the phrase "business pursuits" with respect to exclusions in insurance coverage:

Business in its broad sense embraces anything about which a person may be busy, and in its usual sense, signifies an undertaking or calling for gain, profit, advantage, or livelihood. While "business pursuits" in some contexts is synonymous with "business," it more accurately denotes a continued, extended or prolonged course of business or occupation.

*Stanley v. American Fire and Casualty Co.*, 361 So.2d 1030, 1033 (*citations omitted*).

Another exclusion often found in homeowners insurance policies of the type presently before the Court is the exclusion for acts or events arising out of a contract between the insured and a third party. There are no cases in Alabama directly addressing the effect of a contractual liability exclusion in a homeowners policy when tort claims are brought as a result of the sale of residential property. The Supreme Court of Alabama, however, has twice before discussed the effect of a contractual liability exclusion in unrelated situations. In *United States Fidelity and Guaranty Co. v. National Tank & Machine Works, Inc.*, 402 So.2d 925 (Ala. 1981), the defendant issued a comprehensive general liability ("CGL") policy of insurance to the plaintiff, National Tank and Machine Works, Inc. ("National Tank"). The policy included a contractual liability exclusion similar to the one in the Blockers' Homeowners Policy. National Tank entered into a contract with a swimming pool contractor to provide life hooks for a pool which the contractor was building for the City of Hartselle. The contract with the City of Hartselle required the swimming pool contractor to provide life hooks of a specific description. In performance of its separate contract with the contractor, National Tank furnished life hooks of a different description to the contractor which in turn equipped the pool with the same. Subsequently, an employee of the City of Hartselle drowned in the pool. His administratrix filed an action against National Tank, *et al.* alleging, *inter alia,* that when the employee's supervisor attempted to retrieve him from danger by using one of the life hooks, the handle came apart and the employee drowned. The court wrote:

> In due course, the trial court found that under the amended complaint, the insurer was obligated to defend National Tank. The allegations of the amended complaint pertain to an action *ex delicto* arising out of a contractual relationship, to be sure, but not relying upon it. Those allegations do not depend upon any "liability assumed by the Insured under any contract" but upon an alleged breach of a duty implied by law; hence that exclusion does not apply.

*Id.* at 927.

National Tank, the supplier of life hooks to the swimming pool contractor, did not have a contractual relationship with the decedent or his administratrix. Therefore, any alleged liability for the decedent's death could not be attributed to National Tank on the basis of a contractual relationship between them. Additionally, the Alabama Supreme Court was charged with determining the existence *vel non* of coverage pursuant to a CGL policy broader than the homeowners policy of the type in the case at bar.

The only other case directly involving a contractual liability exclusion in Alabama is *Carter v. Cincinnati Insurance Co.*, 435 So.2d 42 (Ala.1983). In Carter, the court simply determined whether insurance coverage was afforded pursuant to a policy that had a contractual liability exclusion when the plaintiff only sought to recover for breach of an implied contract which was not based on any underlying prior legal obligations. *Id.* at 44. The court then quoted the exclusionary language

from the policy, which read "this insurance does not apply ... to liability assumed by the insured under any contract or agreement." *Id.* The court, noting that it had previously recognized the general applicability of a contractual liability exclusion in *National Tank* a few years earlier, held that the plaintiff's cause of action "falls squarely within the clear and unambiguous terms of the exclusionary provision of the insurance policy." *Id.* Accordingly, the court held that there was no insurance coverage due to the exclusionary language in the policy. *Id.*

In *Allstate Ins. Co. v. Hansten,* 765 F.Supp. 614 (N.D.Cal.1991), an insurance coverage case similar to the one at bar, a contract clause was held to preclude insurance coverage as against tort liability arising from a series of real estate contracts. In *Hansten,* the insured sold a house to the Wedekinds. *Id.* at 615. After a dispute arose concerning disclosure issues, the Wedekinds sued on both contract and tort theories, including: breach of contract, breach of express and implied warranties as well as strict liability, negligence, intentional misrepresentation, negligent misrepresentation, fraud and the intentional and/or negligent infliction of emotional distress. *Id.* The insurance policy at issue did not cover liability based on breach of a contractual duty. *Id.* at 616. In holding that a cause of action for negligence was not covered under the policy, the court explained:

> Although this [negligence] claim does not refer to the Hanstens' contractual duties, the alleged harm could not have been realized without the contract to sell the house. Without the contract, the Hanstens would have had no duty of care towards the Wedekinds. Therefore, the duty alleged to have been breached was a contractual duty, and the policy does not cover such losses ... In general, the claims alleged in the [underlying action] are simply not the

type of claims that a homeowners policy was designed to cover. These allegations result from largely intentional conduct, and they stem from a residential sales contract. Even the claims that sound in tort ... arise directly from the contractual relationship between the Hanstens and [the third party].

*Id.*

## IV. ANPAC's Claims for Exclusion

In the present case, ANPAC contends that it has no duty to indemnify or defend the Blockers for the claims that have been brought against them (both collectively and individually) given the explicit exclusionary clauses in both the Homeowners and Umbrella Policies. The Court begins with a discussion of the business pursuits exclusion.

Both of the Blockers' Homeowners Policies provide, in pertinent part, as follows:

**SECTION II EXCLUSIONS**

1.  Coverage E—Personal Liability ... does not apply to bodily injury or property:

    \*    \*    \*    \*    \*    \*

    b.  arising out of business pursuits of any insured ...

    This exclusion does not apply to:

    (1) activities which are ordinarily incident to non-business pursuits;

*Homeowners Policies* No. 01–H–E03–058–2 and 01–H–H50–828–0.

The Umbrella Policy provides, in pertinent part, as follows:

**EXCLUSIONS**

We do not provide coverage for:

\*    \*    \*    \*    \*    \*

2.  any loss arising out of business pursuits or business property of an insured unless covered by the primary insurance described in the Declara-

tions. Our coverage is no broader than the primary insurance, except for our limit of liability.

*Umbrella Policy* No. 01–U–860–787.

█ The Homeowners Policy excludes "any bodily injury or property damage arising out of [the] business pursuits of any insured ... unless those activities are ordinarily incident to non-business pursuits." Similarly, the Umbrella Policy excludes "any loss arising out of [the] business pursuits or business property of an insured." In the current matter, the applicable business pursuits exclusions operate to preclude coverage as to the state claims brought against Mr. and Mrs. Blocker, both collectively and individually. Mrs. Blocker's purchase of the house with a commercial loan, the subsequent resale of it and her purchase of a lot from the Johnsons with the express intent of reselling that lot to avoid litigation clearly constitutes a business pursuit under the Alabama Supreme Court's interpretation of that phrase. See *Stanley,* 361 So.2d at 1033. During the time period Mrs. Blocker owned the property, construction of the house was completed, interest payments were made and the property was marketed and sold. Furthermore, Mrs. Blocker secured a business loan to acquire the property. These facts alone justify the Court in finding that Mrs. Blocker's purchase and resale of the piece of property in question was a business pursuit.

█ Turning to the McNabb third-party complaint, while the allegations ostensibly center around Mr. Blocker's alleged breach of his fiduciary duty owed to the McNabb Company, it is patently obvious that this cause of action must also be excluded from policy coverage by the business pursuits exclusion. This exclusion applies with equal force to the McNabb Company's cross-claim, leveled against both Mr. and Mrs. Blocker, for the same reason as above; any liability accruing to Mr. Blocker as a result of the alleged breach of his fiduciary duties would not have arisen but for the real estate transfer executed by his wife, a transaction in which he quite clearly played a large role. Additionally, both the Johnsons' complaint and the McNabb Company's third-party complaint contain a number of allegations of intentional fraud. These claims are thus also barred by the Intentional Acts Exclusion found in both the Homeowners and Umbrella policies. See *Townsend Ford, Inc. v. Auto–Owners Ins. Co.,* 656 So.2d 360, 361–362 (Ala.1995).

█ Even if the Homeowners and Umbrella policies did not contain a business pursuits exclusion, which by itself is adequate to preclude insurance coverage in this matter, the Blockers would still not be entitled to coverage. This is because the contractual liability clause in ANPAC's Homeowners and Umbrella Policies clearly exclude liability created pursuant to any contract or agreement, except for those contracts which would directly relate to the maintenance of the insured location not subject to further exclusions elsewhere in the policy. The Johnsons have alleged that Mrs. Blocker breached both express and implied warranties that accompanied the sale of their home, that she recklessly or innocently misrepresented that the new home was free of defects, and that she breached the general terms of the contract between herself and the Johnsons. The Homeowners Policies provide that personal liability coverage does not apply for acts arising under these circumstances, as coverage does not apply to those events arising:

under any other contract or agreement except for those written contracts directly relating to the maintenance of the insured location not excluded ... above or elsewhere in this policy;

*Homeowners Policy* No. 01–H–E03–058–2 and 01–H–H50–828–0.

Any alleged Liability for the breach of warranties claim necessarily depends upon the existence of the underlying contract transferring property from Mrs. Blocker to the Johnsons; without the residential sales contract, Mrs. Blocker would not have had a duty of care towards the Johnsons. *See Hansten,* 765 F.Supp. at 616. Similarly, the allegations leveled against Mr. Blocker and Mrs. Blocker by the McNabb Company would also not have arisen but for the existence of the contract between Mrs. Blocker and the Johnsons. As a result, the Johnsons' claims for breach of contract are excluded from coverage by the Contractual Liability Exclusion provision. *Ajdarodini v. State Auto Mutual Ins. Co.,* 628 So.2d 312 (Ala.1993).

## V. Conclusion

Although no Alabama case directly addresses the specific elements of the case at bar, the Supreme Court of Alabama has sufficiently defined the phrase "business pursuits" to recognize the general applicability of a contractual liability exclusions. That court has identified the exclusionary language as the "clear and unambiguous" terms of an insurance policy. In the instant case, the terms of the policy are clear and unambiguous. It is indisputable that the Johnsons' claims against Mrs. Blocker individually, and all of the claims alleged by the McNabb Company against Mr. and Mrs. Blocker individually and collectively, would not have arisen but for the Blockers' business pursuits and their real estate transfers pursuant to the residential sales contracts described above. Accordingly, the business pursuits exclusion, contractual liability exclusion and intentional acts exclusion of the Blockers' Homeowners and Umbrella policies all operate to preclude coverage for the Blockers for each and every cause of action alleged by the Johnsons and by the McNabb Company in the matters herein.

Due to the foregoing, the Court finds that ANPAC's Motion for Summary Judgment is due to be, and hereby is, **GRANTED**. The Court hereby **DECLARES** that, pursuant to the explicit terms of Homeowners Policy No. 01–H–E03–058–2 and Policy No. 01–H–H50–828–0, as well as Umbrella Policy No. 01–U–860–787, each in effect between ANPAC and the Blockers at all times pertinent, ANPAC has no obligation to indemnify or defend Mrs. Becky M. Blocker and/or Mr. Cuyler Edward Blocker from the numerous state claims that have been brought against them, both collectively and individually, by the parties referenced herein.